# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

BRUCE M. BARTON,            )
                            )
        Plaintiff,        )
                            )
        v.                    )     CAUSE NO.: 1:06-CV-208-TS
                            )
ZIMMER, INC.,             )
                            )
        Defendant.     )

## OPINION AND ORDER

The Plaintiff, Bruce M. Barton, brought suit against his former employer, Zimmer, Inc., pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, and the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2654. This matter is before the Court on the Defendant's Motion for Summary Judgment on All of Bruce M. Barton's Claims [DE 128], filed pursuant to Federal Rule of Civil Procedure 56, along with several other pending motions.

## BACKGROUND

On May 23, 2006, the Plaintiff filed a Complaint and Jury Demand against the Defendant, alleging that in 2004 and 2005, his direct supervisor, Andrew Richardson, created hostile work conditions for, and discriminated against, the Plaintiff on account of the Plaintiff's age. The Complaint states that on July 22, 2005, the Plaintiff filed an EEOC Charge of Discrimination against the Defendant on the basis of Richardson's conduct. The Complaint also alleges that the Plaintiff's FMLA rights were violated when, although he was released to return to work from his FMLA medical leave on August 22, 2005, the Defendant put the Plaintiff on paid leave and did not allow him to return to work until September 13, 2005. The Complaint

alleges that new job duties that the Defendant then gave him involved impossible and unattainable demands, which caused him to again go on medical disability leave. The Complaint contends that the Defendant's conduct was "discriminatory and retaliatory towards Plaintiff on the basis of Plaintiff's age and Plaintiff's exercise of his protected rights under the FMLA and the ADEA." (Pl.'s Compl. ¶ 26.) On July 12, 2006, the Defendant filed its Answer and Affirmative Defenses [DE 15].

After numerous discovery disputes and deadline extensions (and 113 docket entries later), the Defendant filed its Motion for Summary Judgment [DE 128], along with a 33-page Statement of Undisputed Material Facts [DE 142], a 28-page Memorandum in Support of its Motion for Summary Judgment [DE 143], and a nearly 550-page Appendix.

On October 15, 2008, the Plaintiff responded to the Defendant's Motion for Summary Judgment with a 65-page Statement of Genuine Issues and Material Facts [DE 171], a 28-page Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [DE 172], and exhibits of comparable size to the Defendant's.

On November 17, the Defendant filed a Reply Memorandum [DE 179] and an additional 112 pages of exhibits. Also on this date, the Defendant moved to strike [DE 181, 182] as inadmissible portions of the Plaintiff's Statement of Genuine Issues and Material Facts, and affidavits and exhibits that the Plaintiff submitted in opposition to its Motion for Summary Judgment. On December 22, 2008, the Plaintiff responded [DE 188] to the Defendant's Motion to Strike, adding another 141 pages to the docket. The Defendant added 132 pages when it replied in support of its Motion to Strike [DE 189].

Other docket entries related to the pending summary judgment motion are the

Defendant's Filing of Supplemental Authority in Support of Its Motion for Summary Judgment [DE 191], which refers to a District of Columbia employment case decided on December 30, 2008 [DE 192], and the Plaintiff's Response [DE 193] to the supplemental authority, arguing that the decision does not have precedential weight and, in any event, is distinguishable. The Defendant also filed Supplement Authority in Support of its Motion for Summary Judgment [DE 202] on June 1, 2009, to which the Plaintiff responded [DE 203] on June 3.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a

summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609. However, the court is not required to draw every conceivable inference from the record—only reasonable ones. *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989).

## STATEMENT OF FACTS

The Court does not include in this Statement of Facts every factual detail put forward by the parties. The facts stated herein are those deemed relevant and admissible in light of the summary judgment standard of review, the principles governing the admissibility of evidence, and the law applicable to the substantive employment issues presented in this case. The Court will identify when facts are disputed or when their admissibility is challenged, and will provide additional facts to elaborate on legal issues when necessary. The Court does so without making a specific ruling on the admissibility of every piece of evidence that is challenged by the Defendant in its Motion to Strike. Thus, the Court's rulings are those that it deems necessary to a proper analysis of the claims at this stage of the proceedings, specifically, those bearing on whether there is a genuine issue of material fact that must be resolved by a jury or whether the Defendant is entitled to judgment as a matter of law.

### A.      Background

Defendant Zimmer is a corporation engaged in the design, development, manufacture, and marketing of reconstructive orthopaedic products, spinal and dental implants, trauma products, and related orthopaedic surgical products. Knee implants are the Defendant's largest

(by dollar volume) selling product. The Defendant has operations worldwide and is headquartered in Warsaw, Indiana. Zimmer has a Sales Training Department, comprised of employees who are responsible to train Zimmer's sales associates regarding Zimmer's products and selling techniques. These Sales Training Managers schedule training classes, put together programs, facilitate the classes, and teach some of the content of the sales classes.

The Plaintiff was born in 1946. He began working for the Defendant in January 1993, and worked in various capacities in the Sales Training Department. After serving as the Director of Sales Training, he was demoted to a Sales Training Manager on April 28, 1997. The Plaintiff attributed the demotion to the fact that the Defendant replaced his supervisor with one who did not support the work the Plaintiff was doing and who thought that the Plaintiff was not managing his staff correctly. He also believes that the demotion "had something to do with [his] age" because his "boss was quite a bit younger" and "was just very friendly with the younger people," but also admitted that nothing was said to make him believe that his age was a motivating factor. (Barton Dep. 16-17, 19.) The Plaintiff offered to step down from the position as Director to avoid being terminated by his new boss.

After working for about a year as a Sales Training Manager, the Defendant changed the Plaintiff's position, title, and responsibilities. As of December 1, 1998, the Plaintiff became the Manager, Performance Improvement and Development. The Director of the Sales Training Department at that time, Dan Krupp, worked with the Human Resources Department to create the new position for the Plaintiff because Krupp believed that the Plaintiff was skilled in the area of curriculum design, and that his efforts in this area would increase sales. Krupp also gained approval to hire another person to take over the Plaintiff's responsibilities as the knee sales

training manager so that the Plaintiff could concentrate on sales skills and management instead of orthopedic device training. Krupp stated in his affidavit:

> The Manager, Performance Improvement and Development position was designed to be a higher level than the Manager, Sales Training position. Its function was that of the Associate Director and was never meant to be another Sales Trainer position. Barton was not expected to populate, upgrade or teach any of the sales training classes devoted to Zimmer's specific products. The position of Manager, Performance Improvement and Development was formally created for the specific purpose of improving the performance of the sales training department and the field sales force.

(Krupp Aff. ¶ 17.)[1] The Human Resources Department approved a change in title if the new title would accurately represent the employee's job responsibilities. Although there was no official job description for the Plaintiff's new title, according to the Plaintiff's testimony, his main responsibility was to expand, refine, upgrade, and teach consultative selling skills classes globally. He was also responsible for the design and development of training courses and programs in the areas of medical training processes, sales management and leadership training, institutional selling, distributorship training and performance improvement, career pathing, training administration systems, standardization and integration of training processes, training process and delivery, training the trainers, facilitation skills, evaluating trainer effectiveness, meeting design and facilitation, process improvement, strategic planning, and needs assessment.

---

[1] Krupp also attests that the Plaintiff was not a product expert and did not possess the level of technical product knowledge required to develop or teach the technical content portion of a sales training class on any particular product, and that it would have been unreasonable to assign him such a task. In its Motion to Strike, the Defendant argues that Krupp's Affidavit is inadmissible because it refers to matters that occurred at least five years before the events giving rise to the Plaintiff's lawsuit, making the testimony too remote in time to be relevant. Although the Court agrees that Krupp can only speak to the position that the Plaintiff held from 1998 to June 2000, when Krupp left the Sales Training Department, the Court does not agree that the circumstances surrounding the creation of the Plaintiff's position are without relevance, or (as the Defendant argues) that the entire Affidavit should be stricken as inadmissible. However, the Court's consideration of those portions of Krupp's Affidavit that address the title and position that the Plaintiff held within the Sales Training Department during Krupp's tenure must be considered in context with any other admissible evidence concerning changes to this position or the needs of the Department that occurred after Krupp left the Department, changes of which Krupp has no personal knowledge.

The Defendant hired Andrew Richardson on April 1, 2002. From his hire date to July 20, 2003, Richardson was a Sales Training Manager in Warsaw, Indiana. On July 21, 2003, Richardson was transferred to Dover, Ohio, and served as the Sales Training Manager there until May 12, 2004.  On May 13, 2004, Richardson became the Director of Sales Training in Warsaw, where he remained until his employment with Zimmer was terminated on September 12, 2005.

**B.      Richardson as Director**

While Richardson was still in Ohio waiting to hear whether he would be the new Director, he told Patti Saxon ("Saxon"), the Manager for Orthopaedic Surgical Products at Zimmer's Dover, Ohio, facility, that the first thing he was going to do as Director was "get rid of Bruce."  (Saxon Dep. 12). Richardson referred to Barton as "an old dog," "old fucker," and "old drunk."  (*Id*.) Richardson told Saxon that he wanted "new blood." (*Id*.) Richardson also told Saxon that he wanted to get rid of Larry Cline and Mike Schieferstein next because Richardson thought they were both "old and resistant to change" and he wanted "new blood."  (Saxon Dep. 16). In May 2004, Cline was over 54 years old, and Schieferstein's was almost 57.

After Richardson became the Director, he told Barton and Cline that he was going to get rid of Schieferstein because Schieferstein was "old and worthless." (Barton Dep. 38; Cline Dep. 79). Richardson told Cline that Schieferstein was "dead wood" but that he had to back away from any disciplinary action of Schieferstein because Schieferstein had too many connections. (Cline Dep. 27, 73.) Richardson also told Janice Elliott ("Elliott"), another employee in the Training Department, that he wanted to get rid of the old and start with new, specifically identifying the old as Barton, Cline, and Schieferstein. (Elliott Dep. 16). Richardson told Elliott

that he was taking away all of the Plaintiff's teaching duties so he could prove to the Defendant that there was no reason to keep the Plaintiff. (*Id*.) Richardson told Elliott that he was also trying to get Barton to quit by taking all of Barton's work away. (*Id*. at 29–30.) Richardson told Elliott and Cline that he wanted more employees like Scott Bowman ("Bowman") in his department, telling Elliot that Bowman was young blood that he could mold. (Elliott Dep. 16, 30; Cline Aff. ¶ 13.) Bowman was in his 30s.

When he became the Director, Richardson began to further develop and implement a consultative selling skills program called "Power Selling" that was already in place to instruct Zimmer sales associates. The Plaintiff testified that, except for using different terminology, Richardson's Power Selling program was substantially similar to the selling programs he had regularly taught prior to Richardson's arrival and included half of the courses the Plaintiff taught. After the Plaintiff asked Richardson if the Plaintiff could conduct Power Selling, Richardson denied the Plaintiff's request and did the Power Selling presentations himself. The Plaintiff helped Richardson prepare for two to three Power Selling classes, and the Plaintiff also observed Richardson teach these classes. Richardson used the Plaintiff to retrieve items he needed during these classes, such as batteries and photocopies. The Plaintiff felt that he was being treated as a "back of the room gopher."

In about January 2005, Richardson told Barton that he was taking away Barton's responsibility for the Sales Management and Leadership training program. Richardson also took over management of the Plaintiff's portion of the budget for the Sales Training Department. At one point, Richardson asked the Plaintiff if he was willing to be transferred and indicated to the Plaintiff that he should be worried about his job. The Plaintiff asked Richardson for training to

become certified in online training development and in performance improvement. Richardson denied the Plaintiff's requests for the training and gave the online instruction project to Bowman.

1.      *Other Personnel in the Sales Training Department*

Scott Bowman was hired by Zimmer in 1998 as a Knee Product Manager. Bowman was a Senior Training Manager when Richardson became the Director. Richardson told the Plaintiff that he had to develop Bowman so that he could assume more responsibilities, and that he was giving Power Selling training duties to Bowman. While Bowman was training on Power Selling, he was also still the knee sales training manager. Richardson then told Andy Radford, who started with Zimmer as an Associate Manager in October 2004 in the area of knee sales training, to learn Power Selling as well.

Schieferstein was hired by Zimmer on May 15, 1995, and was Zimmer's Hip Sales Training Manager. Cline, hired on January 15, 2001, was Zimmer's Trauma and Extremities Sales Training Manager.

2.      *Corrective Action Plans*

In early 2005, the Plaintiff received his Annual Development Review through the normal course of the performance management process. He was designated a "make call," indicating a deficiency in his performance. Richardson informed Robert Abel, Zimmer's Director of Human Resources, that both the Plaintiff and Cline were not fulfilling the requirements of their positions satisfactorily. To ensure that the requirements and expectations of their positions were objectively established and uniformly understood, Abel counseled Richardson on how to develop

a performance plan for the Plaintiff and Cline. Because both were over age 50, Abel counseled Richardson that it was important to communicate objective requirements for their positions and to have a reasonably uniform standard for everyone in that position, regardless of age. On March 9, 2005, Richardson placed both the Plaintiff and Cline on a 90-day Corrective Action Plan ("CAP"), which is a tool intended to assist an employee with identifying and correcting deficient behavior. Richardson was the primary decision maker responsible for the placement of the Plaintiff and Cline on the CAP. Abel and Mary Batella, Richardson's immediate supervisor, approved the decision based on input received from Richardson. The CAP was not a demotion and did not diminish the Plaintiff's compensation or benefits, or change his position within the Sales Training Department. The Plaintiff remained at management level, retained the same office, worked with the same staff, and retained the same opportunity for advancement. Although the Defendant has the discretion to withhold bonuses from employees who are placed on CAPs, to the knowledge of the Defendant's Vice President of Human Resources, who has been employed by the Defendant since 1988, the Defendant has never exercised this discretion. The Plaintiff received a bonus of $23,480.64 in 2005.

In April 2005, Richardson met with the Plaintiff to give him a one-month assessment on his CAP goals. Richardson was complimentary of the Plaintiff's improvement and gave him high scores for every area evaluated except Power Selling, where he scored him a seven on a scale where ten represented the highest score available. Richardson expressed to the Plaintiff that he apparently had gotten the message and had improved significantly. Richardson gave similar marks to Cline during his one-month evaluation. Both the Plaintiff and Cline were confused, as they considered their work to be unchanged. Later that month, Richardson instructed the Plaintiff

and Cline to develop a joint action plan that would apply to both of them. Sometime after they submitted their joint plan, Richardson praised Cline for his improved performance. Cline did not believe that his performance was any different than when Richardson first placed him on the CAP, and was surprised by Richardson's assessment.

According to Elliot, Richardson told her that he placed the Plaintiff and Cline on CAPs for their poor performance, and later told her that the Plaintiff and Cline had thirty days left to improve their performance, that they had not improved it so far, and that he had no choice but to make sure they were terminated.

On May 19, 2005, Richardson met with Cline to review his CAP, and told Cline that he was performing well. After giving Cline his assessment, Richardson told Cline that the Plaintiff was not performing as he should and that the Plaintiff was not a good fit with what Richardson was trying to do in the Department, commenting that the Plaintiff had nothing to do. When Cline suggested that this was because Richardson had taken away all of the Plaintiff's responsibilities and projects, Richardson responded by changing the subject.

Richardson again met with the Plaintiff on May 19 to review his 90-day CAP. This time, he told the Plaintiff that he was not fulfilling the requirements of the position and was not going to pass the probationary period. Abel was not present at the May 19, 2005, meeting between Richardson and the Plaintiff, and claims that he did not know Richardson thought the Plaintiff was failing. Richardson disputes this in his Affidavit where he avers that he told Abel more than one time that the Plaintiff was fighting the plan and was not succeeding in improving his performance. (Richardson Aff. ¶ 10.)

**3.**     *The Plaintiff's Complaints about Richardson*

On May 23, 2005, the Plaintiff met with his attorney, and on May 24, he provided Richardson with written comments about their May 19 meeting. He told Richardson by email that he believed Richardson was discriminating against him because of his age and subjecting him to an age hostile work environment. The Plaintiff wrote: "I believe that you are looking for ways to terminate my employment because I am almost 60 years old and you want your department filled with the young employees you have been bringing in. I am formally requesting that you stop discriminating against me due to my age and quit subjecting me to the age-hostile work environment you have created in this department." (Barton Dep. 30, Ex. 5; (Abel Aff. ¶ 29.) The Plaintiff did not report his complaints to human resources or anonymously through a toll free number that the Defendant provided for employees to talk to trained, independent interview specialists. The Plaintiff did not inform Abel or Human Resources that he disputed the appropriateness of the CAP. However, the Plaintiff's complaint were made known to Abel when Richardson responded in writing to the Plaintiff's complaints and forwarded several documents to Abel, including a copy of the Plaintiff's written allegations of age discrimination.

Richardson responded to the Plaintiff's allegations in other ways too. He told employees in the Training Department that the Plaintiff was "done" at Zimmer. Even though the Plaintiff was out of the office on pre-approved vacation when Richardson made these comments, the Plaintiff heard about the comments from Cline and Elliot when he called into work at the end of the week.[2] Richardson also told employees in the Training Department how to respond to any

---

[2] The Defendant challenges on hearsay grounds the evidence that the Plaintiff heard from co-workers what Richardson was saying about the Plaintiff's employment. Specifically, the Defendant maintains that the co-workers' retelling of what Richardson said to them is classic hearsay. The Plaintiff responds that the statements are not offered for the truth of the matter asserted, but for the effect on the Plaintiff, that is, "the fact that his medical condition

investigation by management—stating that they should say that the Plaintiff was not performing satisfactorily and that they were required to do the Plaintiff's work. During the Plaintiff's absence, Richardson also sought authorization from Abel to look on the Plaintiff's work computer. After Abel told Richardson that, as a Director, he was allowed to break into the Plaintiff's computer because it was Zimmer property, Richardson accessed the Plaintiff's computer with the help of a Zimmer technology employee. Richardson told this employee to access the Plaintiff's computer to look for personal files that the Plaintiff may have created concerning retention of legal counsel, and also told the employee that he had to fire the Plaintiff because he hired an attorney.

4.     *Barton's Leave, Abel's Investigation, and Richardson's Termination*

The day after he accused Richardson of age discrimination, the Plaintiff went on pre-approved vacation up to and including June 1, 2005. The Plaintiff did not return to work when his vacation ended. Rather, on June 2, he informed the Defendant that he had a serious medical condition that required him to miss work. The Plaintiff immediately went on approved FMLA leave, citing stress as the reason for his leave. He has a long history of depression, anxiety, and panic attacks, and asserts that when he learned that Richardson was telling his co-workers that he was finished at Zimmer he could no longer sufficiently control his depression and panic attacks with medication and counseling. The Plaintiff continued to receive his full salary of $109,011.00

---

worsened." (Pl.'s Opp. to Def.'s Mot. to Strike 11, DE 188.) The Defendant argues that the Plaintiff does not adhere to this limited scope in his response to its Motion for Summary Judgment.

Because the Plaintiff did not designate testimony from the co-workers themselves that they relayed Richardson's comments to the Plaintiff, but offers the statements through his own testimony about what others said to him, the evidence will be confined to its effect on the Plaintiff and to revealing Richardson's desires, not for the truth of the matter that the Plaintiff was actually going to be fired or was fired.

annually and benefits during his FMLA leave, which extended to mid-August.

Abel testified that during the Plaintiff's absence, in late May or early June 2005, he reviewed for the first time the CAP that Richardson had prepared for the Plaintiff. He stated that he was not involved in creating the CAP. According to Richardson's Affidavit, Abel instructed Richardson how to prepare the CAP, and reviewed and provided feedback on the CAPs that Richardson prepared for the Plaintiff and Cline. Richardson also stated that Abel was directly involved in, and agreed with, Richardson's evaluation of the Plaintiff's performance in early 2005.

After receiving the Plaintiff's allegations forwarded by Richardson on May 24, Abel met with Richardson on May 31 and June 7 to discuss the Plaintiff's CAP and investigate the Plaintiff's claim of age discrimination. Richardson openly expressed that he was against allowing the Plaintiff to return to work in the Training Department, citing that he had failed to perform under the agreed CAP. After meeting with Richardson on June 7, Abel drafted an email to Richardson summarizing their discussion, specifically regarding the Plaintiff's performance. The following is a summary of Abel's understanding of Richardson's perspective and characterization of events as set forth in the email: In late 2004 and early 2005, Richardson observed that the Plaintiff was not meeting acceptable levels of performance in his assigned role. To help him improve, Richardson met with the Plaintiff to identify the expectations of his job and to provide coaching. When these informal dialogues were not successful, Richardson created a document titled Sales Training Standards of Performance & Items of Action, which he reviewed with the Plaintiff on March 9, 2005, and which both Richardson and the Plaintiff signed to indicate mutual agreement to the roles and responsibilities of the job and that they were

commonly understood as reasonable and achievable. Richardson communicated to the Plaintiff that he was not meeting the CAP objectives both through verbal feedback and a written follow-up, which noted specific examples of performance deficiencies. The Plaintiff made excuses and failed to take ownership for results that he previously agreed were reasonable. The Plaintiff's performance deficiencies were long standing. After outlining Richardson's position, Abel wrote:

> I agree with your assessment that Bruce has been given every reasonable opportunity to respond to the guidance and coaching that you have provided. To allow Bruce to perform at this level puts significant outcomes at risk that are not only detrimental to the performance of the Sales Training function, but has a potentially serious negative effect on the business performance at large. Therefore, we should proceed in taking the necessary steps of removing Bruce Barton from this position, recognizing the likely outcome will be the termination of his employment from Zimmer, Inc.

(June 14, 2005 email from Abel to Richardson, Pl.'s Ex. 40.)

After meeting with Richardson, the first person Abel wanted to talk to about the age discrimination allegations was Barton himself to understand his claims and the specific issues involved. However, because Barton was out on vacation and then immediately went on FMLA leave, Abel was not able to discuss the Plaintiff's claims with him and could not address his specific concerns. Abel did not contact the Plaintiff during his leave, believing it would be inappropriate to discuss with the Plaintiff the very subject that Abel understood the Plaintiff was citing as the cause of the stress that necessitated his leave. (Abel Dep. 18–19; Abel Aff. ¶ 34.) However, there was some communication between Abel and the Plaintiff while he was on leave. The Plaintiff contends that he told Abel during one of these conversations that the Plaintiff was concerned with the technical demands that may be placed on him in a reassigned position because he did not have technical product knowledge.

On July 13, 2005, the Plaintiff filed a Charge of Discrimination with the EEOC alleging

age discrimination. His doctor released him back to work on August 22, 2005. By this time, Abel was aware that the Plaintiff had filed an EEOC Charge. Abel had attempted to discuss settlement of the Charge with the Plaintiff, but the Plaintiff's counsel complained to Zimmer's outside counsel that Abel was attempting an end-run around the Plaintiff's attorney-client relationship, and Abel did not question the Plaintiff further about resolution of his EEOC Charge.

After the Plaintiff was released to return to work on August 22, Abel met with him for four hours. According to the Plaintiff, he used this meeting to tell Abel "everything with regard to what Andy Richardson had done to me," including taking projects away, assigning some responsibilities that were demeaning, and things Richardson had said. (Barton Dep. 67.) Abel was surprised by much of the information and said that he was not aware of a lot of it. (*Id.*; Abel Aff. ¶ 36.) Abel testified that he did not want to put the Plaintiff in the Sales Training Department without ensuring that he was given a fair and fresh opportunity to succeed and was given job duties and responsibilities commensurate with a manager's position. Abel told the Plaintiff that he needed to investigate the allegations and arranged for the Plaintiff to take administrative (not FMLA) leave with full pay and benefits until Abel could meet again with the Plaintiff and Richardson together to review his job duties and performance objectives.

Because Richardson was out of the office, Abel's meeting with Richardson and the Plaintiff could not occur until Richardson returned on August 25. When they met on the 25th to discuss the Plaintiff's job duties and performance objectives, Abel observed tension between Richardson and the Plaintiff, and the Plaintiff objected to Richardson's proposed list of his job responsibilities, stating that it was a subset of what he expected his responsibilities to be.  In order to ensure that the Plaintiff's job duties were reasonable, appropriate, and commensurate

with his training and experience, Abel allowed the Plaintiff to continue on leave with full pay and benefits. Abel also wanted to complete his investigation into the Plaintiff's allegations without risking aggravation of the tension he noticed between Richardson and the Plaintiff.

After the meeting, Abel asked Richardson to create an entirely new job description and work plan for the Plaintiff. Abel eventually recruited other managers to participate in developing a job description because he did not believe that Richardson was capable of providing one on his own. On August 26, Richardson presented Abel with a draft of a new position and job title, "Manager, Training, Development & Performance," which he had developed with input from Bowman. The new job required the Plaintiff to "be responsible for designing and developing training materials and tools for other departmental functions, to include, but not limited to, Power Selling, Hip, Knee, and Trauma training programs and will conduct this function in 'partnership' with the Training Managers responsible for those programs." (Pl.'s Exs. 58, 59.)[3]

On August 29, Abel emailed the Plaintiff and Richardson to inquire about a follow-up meeting to "come to terms with understanding the job and move forward in a professional and constructive way." (Pl.'s Ex. 65.) Richardson responded with a written statement to Abel setting forth his position that he was adamantly opposed to the Plaintiff returning to the Sales Training Department on grounds that the Plaintiff had not been performing satisfactorily and that his allegations of age discrimination were unfounded.

Richardson, Abel, and the Plaintiff did not meet together again to discuss the Plaintiff's job duties and objectives, or for any other purpose. The Plaintiff continued to inquire into his

---

[3] The Plaintiff never served under this new title, but Abel believes that when an interim director was appointed to replace Richardson, she may have consulted the description.

status, asking Abel during the next several weeks when the Defendant was going to allow him to return to work. Abel informed the Plaintiff that the company was still trying to work out the details regarding his job assignments, and assured the Plaintiff that he was on active status with full pay and benefits. The Plaintiff remained on administrative leave with full pay and benefits until September 13, 2005.

During the Plaintiff's paid leave, Abel had begun interviewing Training Department members individually about Richardson's conduct. Over the course of five days, Abel interviewed eleven current and former department members, in addition to the Plaintiff and Richardson. Abel conducted interviews of Linda Woodruff, Jeff Miller, Larry Cline, Scott Bowman, Andrew Radford, Patricia Saxon, Janice Elliot, Scott Borchelt, Bryan Buccieri, Mike Schieferstein and Deb Miller, and he took notes of each interview. (Abel Dep. 18, 104–06, 111–14).[4]

At the conclusion of his investigation, Abel wrote a memorandum on September 8 to outline the rationale for his recommendation that Richardson's employment be terminated effective September 12. The memorandum stated:

> [i]n response to recent complaints about Richardson by a number of his employees, a comprehensive investigation was conducted to ensure that upper

---

[4] There are some factual disputes surrounding Abel's investigation. The Plaintiff submits in his Statement of Genuine Issues that Abel never asked Cline about Richardson's age discrimination complaints, that Abel's purpose in talking to Saxon was to address Cline's complaints about Richardson, and that Radford testified that he only spoke with Abel about Richardson's conduct toward Radford and not regarding any of Richardson's conduct toward the Plaintiff.

The record reveals that Elliot testified that Abel did not talk to her about the Plaintiff's complaint, but then stated, "[n]o, not that I remember." (Elliot Dep. 43.) Saxon's deposition testimony was that Abel talked to her to gather information about Cline's complaints as well as about the Plaintiff's complaints, and that Saxon specifically relayed comments she heard Richardson make about the Plaintiff. (Saxon Dep. 45.) The record also reveals that Abel has notes from his interview with Cline.

Whether the record contains any disputed issues of fact on these matters that are material to the outcome of the parties' motions will be discussed in the legal analysis section of this Opinion.

management had an objective and balanced understanding of how the sales
training group was being managed. The investigation was also conducted to
address concerns about age discrimination. While the investigation did not
substantiate age discrimination, the investigation did uncover serious concerns
about the management of the sales training group as a whole.

(Abel Aff., Ex. F.) The memorandum described Richardson's management style as "deliberately

divisive." (*Id.*) Specifically, it notes that Richardson discussed employees' performance issues

with other employees within the group, including his belief that they were likely to be

terminated. The memorandum outlined that the CAPs for two employees were mismanaged, that

Richardson accessed an employee's computer despite Abel's finding that there was no legitimate

business reason to access the computer, and that Richardson frequently engaged in criticism of

Zimmer senior management.

On September 12, the Defendant terminated Richardson's employment per Abel's

recommendation. On that same day, the Defendant appointed Sherri Milton as Interim Director

of the Sales Training Department, the CAP put in place by Richardson was eliminated, and the

Plaintiff was informed that Richardson was terminated and told to report to work on September

13 under the supervision of Interim Director Sherri Milton.


**C.      Milton as Interim Director**

Before joining the Sales Training Department as its Interim Director, Milton did not

review the personnel files of any of the Sales Training Department employees. As Interim

Director, Milton did not use or implement corrective action plans and did not refer to corrective

action plans when talking with employees. However, after Milton observed what she believed

was questionable work commitment from the Plaintiff, she began keeping notes of her

conversations with him. The first day that he returned to work, the Plaintiff left early to officiate a football game.[5] Milton did not keep these kind of notes for any other employee.

When she was became the Interim Director, Milton met with each member of the Sales Training Department. Milton conducted her meeting with the Plaintiff on September 14, 2005. During the meeting, the Plaintiff complained about Richardson and the past, and Milton told the Plaintiff that the department was moving forward and that he had a fresh opportunity to show what he could do. The Plaintiff's recollection was that Milton

> asked a question about what I had been doing in the past and yada, yada. I told her and I started to say something like under Andy Richardson and she cut me off mid-sentence and said to me that she doesn't want to receive, hear one negative thing about Andy Richardson. He was a true genius and did an extreme amount of benefit for Zimmer.

(Pl. Dep. 102–03.) The Plaintiff admitted that, when he began to talk about Richardson, Milton said something to the effect that it was time for the department to move forward and that she was not going to listen to the Plaintiff or others complain about what had happened with Richardson because she was now the supervisor. (Barton Dep. 103.)

One of Milton's first tasks as the Interim Director was to assign sales training managers to facilitate the Power Selling classes that had already been scheduled for the balance of the year. Power Selling was one of the most frequently taught classes, and after Richardson's employment was terminated, Bowman and Radford were the only two sales trainers teaching Power Selling. Milton informed the Plaintiff during their first meeting that he would be expected to teach some of the Power Selling classes along with others in the Department, and that some weekend

---

[5] In his deposition, the Plaintiff stated that he was pleased to find out that Milton was his new boss because he thought that she "was a decent person," but that he was not there a "full day before she started on [him]" by "harass[ing]" him for leaving work early. (Barton Dep. 100.)

training would be necessary.[6] The Plaintiff told Milton that weekend training would conflict with his high school officiating contract, which he had always been allowed to work around in the past.[7] Milton also informed the Plaintiff that he, along with Cline and Schieferstein, would be expected to give a "dry run" on Power Selling the following week. The dry run was internal, and it was intended to establish a baseline of where Department members stood in their knowledge of Power Selling and what improvements, if any, they needed to make. Barton was the only one who complained to Milton about being assigned to do the dry run.

Mark Serafino, Zimmer's Director of Curriculum and Faculty Development, created an evaluation form for the dry runs. Serafino, Ken Walker, a sales trainer from Centerpulse, Radford, Bowman, and Milton evaluated the dry run presentations. The Plaintiff believed that the feedback he received for his dry run was "harshly critical and demeaning." (Compl. ¶ 23; Barton Dep. 80.) The Plaintiff complained to Milton that he was never trained in Power Selling and that it was "demoralizing and demeaning" to be critiqued without the benefit of any training, and that he was requesting training. (Pl.'s Ex. 83.) At his deposition, the Plaintiff stated that the panel's review was not accurate, and that the reviewers should have pointed out more positive aspects of his presentation. When asked whether he had any factual basis to believe that the evaluators were not being honest, the Plaintiff responded that their scores may have been

---

[6] Because there is some dispute in the parties' briefing regarding how much weekend training was at issue, the Court notes that the remaining Power Selling schedule included the following dates: Thursday and Friday, September 22–23; Thursday and Friday September 29–30; Friday and Saturday October 14–15; Thursday and Friday October 27–28; and Friday and Saturday November 4–5. Trainers were sometimes required to travel the day before the classes began, depending on their location.

[7] As a follow-up to this, on September 23 the Plaintiff sent Milton an email message advising that he had two previously contracted football games to officiate, which would require him to leave work early. He stated that he would make up the work as he always did in the past, and that, as he mentioned during his meeting with her, he had a verbal agreement with Zimmer that allowed him to officiate during the high school football season. He said this agreement had been in place for the previous twelve years.

honestly given, but that they were not trained to evaluate his presentation. (Barton Dep. 82.) The Plaintiff also complained that he was given competing directions from Milton and Bowman about how to prepare for the dry run, that Milton did not communicate that she had changed the location of the presentation, and that both these factors negatively affected his performance and prompted unfair criticism.

By the time Milton took over as Interim Director, revisions to the Sales Training Department were either already underway within the Department or had been mandated from outside the Sales Training Department by Jon Kramer, Zimmer's Vice President. Milton did not develop these changes, but it was her role to execute them with the assets and personnel available within the Training Department. One such initiative was the Zimmer Online Learning System ("ZOLS") and an executive level class incorporating competitive product information and integrating Power Selling. ZOLS was designed as an online training program to provide newly-hired Zimmer sales associates with the introductory baseline knowledge of Zimmer's products. Under this revised training system, new hires would be required to complete the ZOLS training before meeting with the Sales Training Managers for advanced training. To avoid repeating the information provided by ZOLS, the Sales Training Department was directed to develop a more advanced set of training courses for new hires. The advanced class assumed some prior experience with products and focused on selling against the competition and more challenging aspects of the Defendant's orthopaedic products. The purpose was to improve the quality of the training in all areas—knees, hips, trauma, and Power Selling. Kramer informed Milton that Zimmer was not effectively selling against competitive products and he wanted to see more emphasis on selling against the competition in sales training.

After assessing the available personnel within the Training Department, Milton decided to assign the Plaintiff the task of developing a course integrating product training, Power Selling, and competitive product comparisons for a March 2006 knee products training class. Milton believed that the Plaintiff was qualified for the role because he previously had knee product responsibilities within the Sales Training Department and had taught knee sales training classes. When asked why Milton did not assign the knee task to Radford, who was the knee training manager at the time, Milton testified:

> [W]hen Andy Richardson left, I had three people who could do power selling effectively. And that was Radford, Richardson, and Scott Bowman. And with Richardson's departure, we had a very aggressive power selling schedule that was already established. In fact, we ended up having to cancel a couple of classes because we just couldn't meet the needs with available resources. And Radford's focus needed to be then on power selling and backup, you know, to Scott Bowman.

(Milton Dep. 19–20.) Milton testified that changes within the Department necessitated that all Department employees, not just the Plaintiff, take on new duties. (*Id.* at 64) (giving examples of projects and duties she assigned to Schieferstein and Cline to meet the changing needs of the Department).

Milton informed the Plaintiff of his responsibility to develop the knee course materials on September 23, 2005.[8] Milton gave the same assignment to Schieferstein for hip products and to

---

[8] In the Plaintiff's Affidavit, filed in response to the Defendant's Motion for Summary Judgment, the Plaintiff asserts that in September Milton only told him that he was to prepare a needs assessment and new class outline and design, and that the assignment for content development was not communicated until December. The Plaintiff uses this fact, among others, to support his claim that Milton's assignment was unreasonable. In the Plaintiff's deposition, taken before he prepared the Affidavit, he states that he was told in late September that he would have responsibilities for the knee sales training. This testimony is arguably vague, but the Plaintiff reiterates during a second deposition, which was taken after he submitted the Affidavit, that one of the assignments the Plaintiff had in September 2005 "was to create objectives and new content for the new knee sales training class." (Pl.'s 2nd Dep. 102.)

The Court does not agree with the Plaintiff's assertion that his Affidavit, and not his sworn deposition testimony, should be used to determine whether there is a triable issue of fact regarding when Milton gave him the

Cline for trauma products. She also asked Schieferstein and Cline to present the content of their assignment at the March 2006 training class. Milton gave Barton, Cline, and Schieferstein a list of resources to assist them in developing the course materials. Between September and October 2005, Milton prepared an outline of the steps necessary to put the updated program together and distributed it to Schieferstein for hip products, Cline for trauma products, and the Plaintiff for knee products.

The parties dispute whether the assignment was reasonable for the Plaintiff given his previous experience, the time frame allotted for the project, and the resources available to develop the content of the presentation. The parties do not even agree on the amount of technical knowledge that was actually required to perform the task. The Plaintiff repeatedly expressed to Milton that he did not have the knee product knowledge to be able to develop the training. Although the Plaintiff had facilitated knee training classes in 1997 and 1998, he did not develop or teach the content regarding the technical aspects of the products himself, but used marketing and senior field sales people to do the sales training on the technical aspects. The Plaintiff contends that Cline and Schieferstein did not experience the same problem with their assignments because they had technical product knowledge gained from their positions as Sales Managers. Milton did not remove the Plaintiff from the project in response to his complaints, but recommended resources to him and assured the Plaintiff that he would get help from the marketing department and from Radford and Bowman. She also assigned an intern to work with the Plaintiff through October to develop the knee sales training class.

assignment. *See Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994) (noting that depositions inherently carry an increased level of reliability that affidavits do not because they are adversarial in nature and allow for direct examination and cross-examination). In any event, the Court's conclusion in the analysis section of this Opinion reveals that the dispute regarding the reasonableness of the assignment is not material.

The Plaintiff complains that Bowman was already transferred out of the Department, and that the marketing department did not have the time to provide him with the necessary materials. Although Radford offered to help the Plaintiff for thirty minutes per day, the Plaintiff believed that Radford's offer was useless because he had outdated materials from existing knee sales training classes and did not possess the technical knowledge needed to meet the demands of an executive level class. The Plaintiff believed that it was impossible for him to complete the project by March 2006, because even if he had time to learn the technical aspects of the products and Zimmer's competitor's products, all written class materials had to be approved by the legal department.

In December 2005, Zimmer underwent a major reorganization that moved Bowman out of the Sales Training Department. Bowman's departure caused Milton once again to reassign duties. Radford had previously conducted knee training, but because he was the only remaining Sales Training Manager in the Department who had extensive knowledge of and experience in Power Selling, Milton required Radford to focus on Power Selling. Milton assigned the Plaintiff to assume the knee training duties, and asked him to teach at the March 2006 class. Cline continued to concentrate on trauma products, and Schieferstein on hip products. The Plaintiff continued to express concern to Milton that he was not qualified to teach the technical portion of the class, particularly in the time frame allowed.

### D.     The Plaintiff's Second FMLA Leave

On February 7, 2006, Barton met with Milton and other members of management to present the content of the training materials that he developed for the March 6, 2006, class. Cline

and Schieferstein also met separately to discuss the content for their respective products. Cline and Schieferstein were found to be on schedule but Milton was dissatisfied with the Plaintiff's progress and was concerned that he was failing to meet the objective of the project as outlined in September. Milton believed Barton was not updating the materials quickly enough to meet the March 6 deadline.

According to the Plaintiff, he suffered a panic attack as a result of the February 7 meeting when Milton criticized him in front of upper management and tried to assign him to teach the most complex technical portion of Zimmer's knee products. Radford stated in his deposition that he "felt sorry for Bruce" because he could not do what Milton and Dawson had asked him to do in terms of developing the materials. (Radford Dep. 57). The Plaintiff also submits that he had to leave work for an emergency appointment with his health care provider as a result of being informed that he had to teach a technical content portion of the new executive level knee sales training class, yet still did not know what the specific subject was to be, and with less than one month to prepare and complete the project.

The Plaintiff informed Abel that same day that he wanted to meet with Abel to discuss Milton's unreasonable demands, and that he believed the demands were designed to retaliate against him for filing EEOC charges. The Plaintiff also told Abel that his therapist had taken him off work until February 14, 2006, when she could re-evaluate him. Abel told the Plaintiff that he would be happy to meet with the Plaintiff and that he should let Abel know when he was coming back to work. On February 14, the Plaintiff's therapist extended his medical leave for an additional six weeks. The Plaintiff was on short-term disability, followed by long-term disability. The Plaintiff also began to accrue social security disability benefits; February 7, 2006, was the

date of disability. On November 2, 2006, the Plaintiff retired from Zimmer.

After the Plaintiff required the second FMLA leave on February 7, 2006, Bowman, Serafino, and Zimmer's marketing department prepared, and Radford conducted, the portion of the March 2006 class that had been assigned to the Plaintiff. Marketing personnel taught the knee product portion of the class.

## DISCUSSION

### A.    The Plaintiff's ADEA Intentional Discrimination Claim

Under the ADEA, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[9] A plaintiff may prove discrimination under the ADEA using either the "direct method" or the "indirect method." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). "[W]hether a plaintiff proceeds under the direct or indirect method of proof, the ultimate standard is the same: the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class." *Id.* at 1061–62; *see also Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009) (holding that in ADEA disparate treatment cases, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged

---

[9] The ADEA follows the same legislative pattern as Title VII, *EEOC v. Elrod*, 674 F.2d 601, 607 (7th Cir. 1982), and courts "employ essentially the same analytical framework to employment discrimination cases whether they are brought under the ADEA [or] Title VII," *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 n.4 (7th Cir. 2003). However, this does not mean that Title VII and the ADEA are the same in all respects. For example, the Supreme Court recently held that, unlike Title VII, the ADEA's text does not authorize mixed-motives claims. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349–50 (2009).

employer decision"); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (stating that the "focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action").

Here, the Plaintiff states that he is proceeding under the direct method of proof. Accordingly, he will survive summary judgment by showing sufficient evidence from which a jury could find that the employer took the adverse employment action for a discriminatory reason. *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir. 2009). This may be "an admission of discrimination" or "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). This does not mean that circumstantial evidence must necessarily have a "mosaic-like character." *Sylvester v. SOS Children's Villages, Ill.*, 453 F.3d 900. 903 (7th Cir. 2006). "The 'convincing mosaic' standard is simply shorthand for the requirement that [the plaintiff] must present circumstantial evidence that, when considered together, would permit a jury to believe that the defendants retaliated [or discriminated] against her." *Cole v. Illinois*,  562 F.3d 812, 815 n.2 (7th Cir. 2009).

In many employment discrimination cases, the parties do not dispute that the employee has suffered an adverse employment action, that is, a refusal to hire, a discharge, or another action that affected the employee's compensation, terms, conditions, or privileges of employment. In these cases, the sole issue is whether the action was the result of unlawful discrimination. In this case, however, the issue is not evidence concerning Richardson's motivation. Rather, the issue is whether the Plaintiff suffered any adverse employment action. If

the Defendant is correct in its argument that the Plaintiff suffered no adverse employment action, the Plaintiff does not have a viable ADEA claim.

> The ADEA outlaws discrimination in the workplace on the basis of age, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985), not changes in duties or working conditions that cause no materially significant disadvantage to an older employee. As one district court aptly put it, "the [ADEA] is not intended to prevent employers from changing the job responsibilities of their 40 to [70] year old employees. Neither is the Act intended to give 40 to [70] year old employees the right to walk out and sue their employer because they dislike their changed job responsibilities." *Frazer v. KFC National Management Co.*, 491 F. Supp. 1099, 1105 (M.D. Ga.1980). To establish a violation of the ADEA, therefore, a plaintiff must prove that she suffered a materially adverse change in the terms or conditions of her employment because of her employer's discriminatory conduct. *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1424 (7th Cir. 1986); *see* 29 U.S.C. § 621(a)(1) (stressing that the ADEA was designed to promote the interests of older workers who had lost jobs or suffered similar disadvantages in their efforts to retain employment).

*Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989) (parallel citations omitted) (brackets in original)); *see also Brewer v. Bd. of Trs. of Univ. of Ill.,* 479 F.3d 908, 916–17 (7th Cir. 2007) (noting that Title VII's prohibition against discrimination with respect to terms, conditions, or privileges of employment reaches only "material, sufficiently important alterations of the employment relationship (often referred to as 'adverse employment actions')"). Thus, no matter how biased Richardson was against older workers, his prejudice is only actionable if it resulted in injury to the Plaintiff. *Cf. Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (noting that "bigotry, per se, is not actionable," and that there "must be a real link between the bigotry and an adverse employment action").

"A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique

to a particular situation." *Crady v. Liberty Nat'l Bank and Trust Co. of Ind.*, 993 F.2d 132, 136

(7th Cir. 1993). In *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744–45 (7th Cir.

2002), the Seventh Circuit identified three categories of cases (including a variant of the second

category designated as 2a) that provide the requisite act of discrimination to support a Title VII

claim, and noted that categories 2, 2a and 3 often overlap. *Id.* The first category of cases are

those where the employee's compensation, fringe benefits, or other financial terms of

employment are diminished, such as occurs in a termination of employment. *Id.* at 744.

Second are cases in which "a nominally lateral transfer with no change in financial terms

significantly reduces the employee's career prospects by preventing him from using the skills in

which he is trained and experienced, so that the skills are likely to atrophy and his career is likely

to be stunted." *Id.* A variation of this occurs when an employee is not actually transferred, but his

job is nonetheless "changed" in a way that "injures his career." *Id.*

> These cases differ from those in the first category only in involving a future rather
> than present harm; the harm nevertheless is financial. They are to be distinguished
> from cases involving "a purely lateral transfer, that is, a transfer that does not
> involve a demotion in form or substance. . . . [Such a transfer] cannot rise to the
> level of a materially adverse employment action. A transfer involving no
> reduction in pay and no more than a minor change in working conditions will not
> do, either."

*Id.* at 744 (brackets in original (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274

(7th Cir. 1996)). A purely lateral transfer that involves different, but not less significant,

responsibilities and that involves no change in salary or benefits, is not an adverse employment

action. *Crady*, 993 F.2d at 136 (finding that transfer from a bank branch manager position to

another branch's collections officer position was not an actionable change in employment

status).

With the third type of case, the employee is not moved to a different job or the skill requirements of his present job are not altered, "but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Herrnreiter*, 315 F.3d at 744. "It also includes cases of harassment—mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee." *Id.* at 745.

Although the Plaintiff's summary judgment briefing does not specifically mention the three categories described above, it does refer to adverse actions that would be recognized under two of the categories: the Plaintiff contends that he suffered an adverse employment action when Richardson took away his significant duties, and when he was terminated from the position he held before Richardson became his supervisor. The Court will analyze the Plaintiff's claims according to the categories recognized in *Herrnreiter*, starting with the first category. Although it is not entirely clear that the Plaintiff intended to argue that he suffered a traditional termination of employment with immediate negative financial impact, his incorporation of "termination" and "fired" throughout his analysis calls for a discussion under the first category of cases. The Plaintiff argues that "he was **fired** from his position as Mgr, Perf Improv & Dev—clearly fired per Richardson's repeated comments and per Abel's June 14, 2005 email." (Pl.'s Mem. 7) (Plaintiff's emphasis). However, the Plaintiff's employment was not terminated, his salary did not decrease, and he did not lose any benefits. Neither Richardson's stated desire to others in the

Training Department that he wanted to get rid of the Plaintiff, nor Abel's email message expressing agreement with Richardson's assessment that the Plaintiff was underperforming and that the Company should move forward with removing the Plaintiff from his position, was an official act of the employer that altered the Plaintiff's employment status or impacted his financial position. The Plaintiff was never told he was fired (the email message was not intended as a communication to the Plaintiff, as it was not addressed to him or copied to his attention), and no official records of the employer memorialized a termination. A threat of potential future action carries no present financial burden, a factor necessary to the first category of adverse employment actions. Although the Plaintiff also points out that "Richardson never recommended or obtained a raise or stock option" for the Plaintiff (Pl.'s Mem. 4), he has not designated any evidence to indicate he was entitled to such benefits, or that he would have received them under a different supervisor. The loss of monetary gain to which an employee is not automatically entitled is not an adverse employment action. *Cf. Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (finding that the plaintiff's claim that she suffered an adverse employment action when she was denied a discretionary bonus failed as a matter of law). Neither did Richardson's placement of the Defendant on a CAP create a present financial harm. An improvement plan that does not deprive the employee of responsibilities, pay, or benefits is not an adverse employment action. *Cf. Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009) (finding that the adoption of an improvement plan did not constitute a materially adverse action to support an FMLA retaliation claim).

Although the facts do not support a finding of adverse employment action under the first category of cases, the Plaintiff's claim that Richardson took away his significant job duties fits

squarely within the second category of cases. The Court finds that there is a triable issue whether the Plaintiff suffered an adverse employment action when changes to his job injured his career prospects to the degree contemplated by the second category of cases described in *Herrnreiter*. Based upon the evidence before the Court, a jury could reasonably conclude that taking away the Plaintiff's selling duties and failing to replace them with comparable work subjected him to future harm because it prevented him from "using the skills in which he [was] trained and experienced," and injured his career. *Herrnreiter*, 315 F.3d at 744.

The Plaintiff has presented evidence that the focus of his job as Manager, Performance Improvement and Development, was on selling skills. When Richardson became the director, he took away the Plaintiff's responsibilities for teaching the selling skills classes, which comprised 50% of the classes that the Plaintiff taught. The Plaintiff testified that Richardson also took away his budget responsibilities and his duties related to the Management and Leadership program. When the Plaintiff requested to be involved in the on-line learning project, Richardson gave the project to another employee and did not develop the Plaintiff for any new duties to replace those that he removed. Richardson himself made comments to the effect that the Plaintiff did not have enough work to do and told the Plaintiff that he should be concerned about his job.

On the other hand, there is evidence that the Plaintiff was still involved in significant projects, including working with Medtronics to market computer assisted surgery technology, and tracking whether and to what extent the Defendant's sales associates were successful in using the information provided by the Training Department to persuade physicians to switch to the Defendant's products. Whether these projects were within the Plaintiff's area of training and experience, such that he was able to continue to use his skills, is a question of fact that precludes

summary judgment. Likewise, the fact that the Plaintiff's day was still filled with work is not dispositive, as it does not address whether his responsibilities were significantly reduced. A dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action even if the time required to perform the duties remains constant. *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994). Whether this is the scenario that occurred in this case is for a jury to determine.

Whether the changes to the Plaintiff's job instituted by Richardson actually injured the Plaintiff's career, such that he would realize financial harm in the future, is another question that cannot be resolved at the summary judgment stage. Although Richardson's actions did not have the effect of causing the Plaintiff's termination or removal from the Training Department during his tenure, there is sufficient evidence in the record to allow a jury to decide that the Plaintiff's future career prospects were damaged by Richardson's actions as Director. After Richardson's employment was terminated, and Milton became the Interim Director, it is reasonably possible that the job responsibilities the Plaintiff performed (and did not perform) during Richardson's tenure had some bearing on assignments that Milton (without regard to age) gave to him. Milton testified that assigning instructors for Power Selling was one of the first major tasks facing her as Interim Director. Radford and Bowman were already conducting Power Selling, and Milton continued to use them in this capacity.

The Defendant argues that it was the Plaintiff's own refusal to teach Power Selling that negatively affected his opportunity to teach the course and Milton's decision. The Defendant contends that Milton asked the Plaintiff to conduct Power Selling classes on weekends, but that he refused because it conflicted with his high school officiating duties. The Plaintiff states that

he never refused to do Power Selling classes for the Defendant on the weekends, and that he was not assigned to teach any Power Selling classes except for a few hours of a class in November 2005. This creates a question of fact regarding the basis for Milton's decision, specifically whether Richardson's failure to train the Plaintiff in Power Selling affected Milton's consideration of the Plaintiff for the role of teaching Power Selling—or whether the decision was more directly related to his unwillingness to teach classes that conflicted with his officiating contract. The Plaintiff's poor reviews on his "dry run" for the selling training may have also been a factor in Milton's decision whether to assign him permanently as a presenter, but a jury could reasonably conclude that the poor reviews were the result of the Plaintiff's limited exposure to the class during Richardson's tenure as the Director, particularly as compared to the training and experience gained by Radford and Bowman during this same time. A reasonably jury could also conclude that the Plaintiff would not have been required to perform a dry run had he already been teaching Power Selling on a regular basis. Given the totality of the circumstances, when Milton was faced with demands from Zimmer that required changes to be made within the Training Department, she did not assign Power Selling duties to the Plaintiff. Rather, she assigned him a job responsibility considerably different than his previous work, and to Radford, who was trained by Richardson to conduct Power Selling, the Power Selling duties. The Court notes that the issue is not that the Plaintiff's assignment from Milton lacked significance or that she continued to discriminate against the Plaintiff, but that he realized an adverse employment action because of previous discrimination when he was not allowed to operate in an area in which he was trained and experienced, perhaps causing his true skills to atrophy and his assignment to a task at which he would face a higher risk of failure. When the

inferences of these circumstances are viewed most favorably to the Plaintiff, as they must be at this stage of the litigation, there is sufficient evidence from which a jury could reasonable find that the Plaintiff suffered an adverse employment action because his future career prospects were damaged when Richardson took over his selling training duties, trained two younger employees to conduct the classes, and did not otherwise allow him to use his training and experience.

There is also sufficient evidence from which a jury could determine that the adverse action was the result of unlawful age discrimination. A supervisor's stated plan to get rid of older workers is direct evidence of discriminatory intent that precludes summary judgment. *See Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir. 2005) (finding that statements by supervisors about their plan to get rid of older workers and replace them with younger, faster workers was direct evidence of discriminatory intent sufficient to allow the plaintiff to take his case to trial). The evidence is that while Richardson was still working at the Defendant's Dover, Ohio facility, and before being offered the position of Director in 2004, he referred to the Plaintiff while speaking to Saxon as an "old dog," an "old F'er," and an "old drunk." Richardson also referred to Cline and Schieferstein as being old and resistant to change. By themselves, these comments are not sufficiently related to the employment decision at issue. However, within a week or two of becoming the Director, Richardson told Elliot that he wanted to "get rid of the old and start with the new" in reference to Barton and Cline, that he wanted "young blood that he could mold," and that he was "going to get rid of the old guys." After Richardson placed the Plaintiff on a CAP, he told Elliot that he was taking all of the Plaintiff's work away in the hope that it would drive the Plaintiff away, and that he wanted fresh blood in the Department. These comments meet the

criteria of both (1) being made by a decisionmaker or someone who provides input into the decision, and (2) being related to the employment action complained of. *Gorence v. Eagel Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (distinguishing between comments that constitute evidence that a decision was discriminatory and those that cannot support a direct-method-of-proof case); *see also Miller v. Am. Family Mut. Ins.*, 203 F.3d 997 (7th Cir. 2000) (noting that, because there has to be a link between the alleged prejudice of a manager and the adverse action at issue, allegedly discriminatory statements under the direct method of proof are relevant only if they are both made by a decisionmaker and related to the employment decision).

For these reasons, the Court finds that the Plaintiff has presented sufficient evidence to allow a reasonable jury to find that he suffered an adverse employment action during Richardson's tenure as Director and to infer that the adverse action was the result of intentional age discrimination.

**B.      The Plaintiff's ADEA Hostile Work Environment Claim**

The Plaintiff claims that Richardson created a hostile work environment. The Defendant submits that the designated evidence does not establish an objectively offensive work environment, and that even if it did, the Defendant is entitled to the affirmative defense that is available when the employer has exercised reasonable care to prevent and correct promptly any discriminating behavior and the plaintiff has unreasonably failed to take advantage of any preventive or corrective opportunities.

The Seventh Circuit has "assumed, but never decided that plaintiffs may bring hostile environment claims under the ADEA." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th

Cir. 2005). The parties also assume that the Plaintiff may bring a hostile work environment claim under the ADEA.[10] However, the Plaintiff begins his analysis with the curious—and unsupported—statement that "[b]ecause there is direct evidence that Richardson discriminated against Barton because of Barton's age, there is no need for Barton to prove that Richardson's stated age hostile purpose and actions rose to the level required to support an actionable hostile environment claim." (Pl.'s Mem. 9.) This argument runs counter to well-developed case law, which provides that a hostile work environment is actionable not merely because animus exists, but because the harasser creates a hostile atmosphere based on the prohibited animus. *See Chambers v. Am. Trans Air, Inc*, 17 F.3d 998, 1004 (7th Cir. 1994) ("Liability under Title VII does not turn on the bigotry of company managers unless that bigotry resulted in injury to the plaintiff."). Injury for harassing behavior only occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (stating that "conduct must be extreme to amount to a change in the terms and conditions of

---

[10] There may be good arguments to make against the application of a hostile work environment theory of recovery under the ADEA in light of differences in the historical and social contexts of the ADEA and Title VII. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 232–34 (2005). Admittedly, any such argument would run counter to the premise "that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes"—a premise the Supreme Court has consistently applied to the language in the ADEA that was 'derived *in haec verba* from Title VII.'" *Smith*, 544 U.S. at 233–34; *but see Gross*, 129 S. Ct. at 2349 (warning in an ADEA case that "[w]hen conducting statutory interpretation, [courts] 'must be careful not to apply rules of applicability under one statute to a different statute without care and critical examination.'" (quoting *Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147, 1153 (2008)). Because the parties do not develop any such arguments, and because the Court concludes that the complained-of conduct does not constitute a hostile work environment, it need not decide whether the ADEA contemplates recovery for a hostile work environment created on the basis of age.

employment"). This is to keep Title VII from becoming a "general civility code." *Faragher*, 524

U.S. at 788. Judge Easterbrook has offered the following observation when discussing what

constitutes "discrimination:"

> [T]he Supreme Court has held that, although any "tangible employment action"—lower pay or another "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits", *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)—may be treated as "discrimination," only a "severe or pervasive" change in the daily "conditions" of employment may be treated as discriminatory. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

*Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 660–61 (7th Cir. 2005) (parallel citations

omitted). In *Meritor*, the Supreme Court clarified that "not all workplace conduct that may be

described as 'harassment' affects a 'term, condition, or privilege' of employment within the

meaning of Title VII." 477 U.S. at 67. Thus, assuming that a hostile work environment claim can

be brought pursuant to the ADEA, it can only be because the complained of conduct is

sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and

create an abusive working environment.

Despite the Plaintiff's misplaced argument about the burdens of proof applicable to this

claim, he goes on to designate the evidence he contends shows that Richardson's conduct met

this standard. The Plaintiff identifies as harassing behavior Richardson's practice of engaging in

discussions with employees in the Training Department about the substandard performance of

other employees and Richardson's belief that these employees were likely to be terminated. The

Plaintiff also argues that Richardson made him a "back of the room gofer," by having him get

things that Richardson forgot or do things for Richardson when Richardson failed to prepare in

advance of class, and that, during one of these same classes, Richardson called him an incompetent test preparer. The Plaintiff asserts that Richardson humiliated and belittled him on a "regular basis" in front of others. (Pl.'s Mem. 10). He contends that Richardson instructed Radford to assign menial work to the Plaintiff to see how he would react and had Bowman and Radford spy on him. The Plaintiff states that Richardson publicly told the Plaintiff that he could not teach the selling skills classes because the Plaintiff did not "have it in him any more." (Pl.'s Mem. 11.) Additionally, he claims that Richardson gave him small projects and then nit-picked over them for days.

Whether an employer's conduct creates a hostile work environment is not subject to "a mathematically precise test" and "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22–23 (1993). Among the factors that are important in evaluating whether harassment is objectively severe or pervasive are "the frequency, severity, and threatening or humiliating nature of the discriminatory conduct and whether it unreasonably interferes with the employee's work performance." *See Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted). Furthermore, it is not enough that the conduct is offensive; the plaintiff must be "subjected to unwelcome harassment *on the basis of*" a protected characteristic—in this case, age. *Kriescher v. Fox Hills Golf Resort & Conf. Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004) (emphasis added). These factors are intended to "assist judges in determining which claims deserve to survive summary judgment and go to trial" by aiding the determination "whether a reasonable trier of fact could find that plaintiff was harassed, that [ ]he was harassed because of [age], and that the conduct was severe or pervasive enough to create a subjectively and objectively hostile work environment." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693

(7th Cir. 2001).

Some of the conduct the Plaintiff cites as harassment cannot form the basis of a hostile work environment. For example, the Plaintiff complains that Richardson asked other employees to spy on the Plaintiff. However, there is no evidence that the Plaintiff was aware that Richardson made this request or that he had knowledge that any employee engaged in spying, and thus it is not relevant to showing a hostile work environment. *Cf. Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000) (holding that comments of which the plaintiff was not aware were not harassment of the plaintiff and not relevant to show the severity or pervasiveness of the plaintiff's hostile work environment). Moreover, there is no evidence that the spying had any impact on the Plaintiff or his work and thus no evidence from which to infer that these acts of spying contributed to an unworkable environment. Likewise, the record is void of any evidence that the Plaintiff was aware that Richardson inappropriately talked to Cline (another employee in the protected age group) about the Plaintiff's CAP, or the possibility that the Plaintiff would be fired. The Plaintiff overstates the evidence about being called an incompetent test preparer. The only designated evidence regarding the Power Selling class tests is that Richardson told the class that he was not going to conduct any testing because the tests Richardson had were not accurate (Pl. Dep. 43–44), not that Richardson told the class that the Plaintiff was an incompetent test preparer or otherwise identified him as the person responsible for the unavailability of tests for that class.

The Court turns next to the Plaintiff's claim that he was humiliated and belittled on a "regular basis." In support of this claim, the Plaintiff points to Cline's testimony about a staff meeting where Richardson unfairly berated the Plaintiff by asking him why a large project

Richardson had assigned to the Plaintiff was not finished and called the Plaintiff "foolish." (Cline Dep. 76–77.) Cline also testified that Richardson would interrupt the Plaintiff and Cline when they made suggestions during brain storming meetings and then ask two younger employees their opinions, and that this was "a little humiliating." (*Id.* at 78.) The Plaintiff was also told on one occasion in front of others that his skills were no longer needed, and was ordered during two to three training classes in which he was an observer to get batteries and make copies for Richardson. Elliot testified that Richardson tested the Plaintiff "every day" (Elliot Dep. 21): "He would just give Bruce little projects to do that would take Bruce about two minutes to do, and then Andy would pick over it for days just going back and forth to Bruce just to try to keep him coming into the office." (Elliot Dep. 22). The Plaintiff also believes that on one occasion, Richardson prompted a less senior employee to give him a clerical-type job assignment to see how he would react, and that this was related to the Plaintiff's age.

Considering the totality of circumstances, the Plaintiff does not describe an environment that was "permeated with discriminatory intimidation, ridicule, or insult," *Shannoff v. Illinois Department of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001), and the conduct was not so "extreme" that it amounted to a change in the terms and conditions of the Plaintiff's employment, *Faragher*, 524 U.S. at 788. The Plaintiff argues that the "best evidence" that he was subjected to a hostile work environment is found in Abel's memorandum recommending Richardson's termination. (Pl.'s Mem. 10.) The Plaintiff notes that Abel concluded that the working environment in the Training Department was beyond repair, Richardson was deliberately devisive, Richardson mishandled performance issues, and his conduct was pervasive and observed by nearly everyone in the group. The Plaintiff argues that, because Richardson had

a stated goal of getting rid of the old guys, the "fact that Richardson created a hostile workplace **for everyone** is irrelevant." (Pl.'s Mem. 10) (Plaintiff's emphasis) (referring to other employees in the Department affected by Richardson's leadership as "collateral damage"). The Court does not agree with the implication that, because Richardson had made comments evidencing animus toward the Plaintiff because of his age, the Plaintiff is relieved of his burden of showing a connection between his age and the conduct that he alleges was harassing. *See Patton*, 276 F.3d at 339 (holding that abusive conduct that was purely personal could not state a claim for harassment); *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (holding that a workplace that is unsavory for any reason other than membership in a protected class does not implicate a federal claim). There is nothing inherent in Richardson's requests of the Plaintiff to retrieve items during Power Selling classes that would suggest to him that age played any part in the treatment. The Plaintiff himself does not believe that the conduct he thought was "patronizing" had anything to do with his age. (Pl.'s Dep. 39.) The one exception, his belief that Richardson asked a less senior employee to assign the Plaintiff a job because he was trying to antagonize him on the basis of his age, is too conjectural. "[I]f subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841–42 (7th Cir. 1996). Elliot's testimony that Richardson tested the Plaintiff every day is not accompanied by any specific examples of the types of projects Richardson gave the Plaintiff, or how Richardson scrutinized his work. Thus her testimony does not suggest any personal knowledge as to whether the scrutiny was justified, much less that it was because of the Plaintiff's age. Moreover, Elliot

testified that Richardson treated her the same way that he treated the Plaintiff: "he would belittle you and cut you down and make you feel like you were probably the most worthless person in the department." (Elliot Dep. 21.) Cline also testified that Richardson "continually harassed Janice [Elliot]."[11] (Cline Dep. 79.) Elliot testified that Richardson treated Cline badly by talking about how bad his classes were, but that he was "okay" with Schiferstein, and speculated that it was because he was stern when he talked and did not back down. (*Id.* 22–23.) But Cline stated that Richardson would comment to others that Schiferstein was "worthless" if Schiferstein's name came up. (Cline Dep. 79.) The fact that Richardson was "nice" to the younger Bowman and Radford is not sufficient to connect Richardson's unpleasant actions towards the Plaintiff and others in the Department to age. *Cf. Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) (noting that "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority"). Moreover, Elliot testified that Bowman forwarded to her "a pretty bad email" that Richardson had sent to him after a meeting, explaining that, although she did not remember the exact content of the email or the situation it addressed, "Andy Richardson liked to play games with our whole department is all it was." (Elliot Dep. 26–27.) Even Bowman, whom Richardson was alleged to have favored, had conflict with Richardson, and Abel's investigation confirmed Richardson's divisive management style.

Although Richardson made statements evidencing an intent to get rid of the "old guys," none of these statements were communicated to the Plaintiff, were intertwined with the actions

---

[11] Although Elliot was over age 40, she did not believe that Richardson's conduct toward her was related to her age. She eventually complained to Abel about Richardson's "general treatment" of her. (Elliot Dep. 41.)

of which the Plaintiff complains, or were related to these actions. Being required to make copies or get batteries, and being ignored during Department meetings, although humiliating on some level, does not appear to have any connection to whether the Defendant would continue to employ the Plaintiff. Importantly, the Plaintiff stated in his deposition that he never experienced any first hand comments from Richardson about his age. (Pl.'s Dep. 38–39) (testifying that Richardson never said anything to the Plaintiff about his age or about getting rid of him because he was old).[12] The Plaintiff heard Richardson once say he was going to get rid of another employee because he was old and worthless, but comments of this kind, not directed at the Plaintiff personally but simply made in his presence, have a lesser impact than harassment directed at the Plaintiff. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005). Thus, while a reasonable person in the Plaintiff's position would conclude that Richardson did not appreciate the Plaintiff's skills or experience, was a poor manager, and was generally unpleasant, the reasonable person would not have a basis in fact to believe that Richardson was permeating the workplace with age discriminatory intimidation, ridicule, and insult, and singling the Plaintiff out because of his age.

---

[12] However, in response to the Defendant's Motion for Summary Judgment, the Plaintiff submitted his own affidavit testimony that, during Richardson's early days as Director, he told the Plaintiff that "upper management" instructed Richardson to "get rid of the dead wood and get some new blood in here," "the old ways are not good enough," and "get rid of the old and bring in the new." (Barton II Aff, ¶ 25; Barton II Aff Ex. 1). The Plaintiff states that he could not remember these comments during his deposition.

The Defendant argues that this testimony should be stricken because it was not disclosed by the Plaintiff in his deposition and that the "diary" exhibit that the Plaintiff credits with refreshing his recollection of these statements should be stricken because it was not disclosed in discovery despite the Defendant's specific request for production of any such document. The Defendant deposed the Plaintiff a second time after learning about the diary.

The Court need not resolve this dispute at this juncture. Even if the Plaintiff heard Richardson make these comments at the beginning of Richardson's tenure, they would not elevate the totality of behavior to the requisite severity or pervasiveness to constitute a hostile work environment. It would also not change the testimony from the Plaintiff that Richardson had not made any comments directly to the Plaintiff about his age or getting rid of him in particular because of his age.

Even if age bias is assumed on the basis of Richardson's other comments, the complained-of conduct was not sufficiently severe or pervasive as to alter the Plaintiff's conditions of employment. The conduct described by the Plaintiff may more appropriately fit the category of "rude," "arrogant," or "boorish" behavior that is insufficient to state a claim. *See Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) (rejecting hostile work environment claim even though the plaintiff's supervisors treated her rudely, ignored her suggestions, failed to communicate changes at work, and severely criticized her without good reason because "a reasonable jury could not have determined this treatment to be so severe or pervasive as to alter the plaintiff's conditions of employment in a significant way"). The Court is aware that conduct need not be both severe and pervasive, that a relentless pattern of lesser harassment that extends over a long period of time can create a hostile work environment, and that no magic number of incidents is required to establish a hostile work environment. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (finding that the plaintiff provided sufficient evidence of the pervasiveness of the harassment to survive summary judgment by testifying that the harassing individual made at least eighteen sexist or sexual comments in less than a year's time and made similar comments "very often").

Here, there is no indication how often the brain storming meetings where Richardson ignored the Plaintiff's suggestions or the staff meetings where Richardson scrutinized and belittled the Plaintiff occurred. Moreover, Cline's testimony reveals that Richardson made many of the objectionable statements outside the Plaintiff's presence. (Cline Dep. 76–77) (testifying that "quite often these [comments] were made when Bruce was not there"); *id.* at 78–79) (stating that Richardson "would make comments in front of other people as a group that Bruce is just not,

doesn't have enough to do. We would hear that a lot."). The Plaintiff was treated as a back-of-the-room gopher in Richardson's Power Selling classes on two to three occasions.

Although Elliot's testimony suggests more frequent conduct, she does not put a time frame on the testimony that the assignment of small jobs and scrutiny occurred "every day," such as whether it was every day for a week, a month, or several months within the sixteen-month time frame that Richardson was the Plaintiff's supervisor. Richardson could not have "tested" the Plaintiff in this manner every day because Richardson's duties required him to travel. *See Parker v. Federal Nat'l Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984) ("The district court is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones."). Additionally, Rule 56(e) requires "specific facts showing a genuine issue for trial." Fed. R, Civ. P. 56(e).

The evidence, viewed most favorably to the Plaintiff, supports an inference that during the course of Richardson's tenure as director the Plaintiff was frequently given small tasks to perform, was criticized harshly for his job performance, and was marginalized during meetings and in front of other co-workers on several occasions. However, the complained-of conduct is too tepid and the testimony about the frequency of facially-neutral conduct too ambiguous for a jury to reasonably conclude that the acts were sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment on the basis of his age. The Plaintiff has not presented evidence that he suffered under an atmosphere of abuse that unreasonably interfered with his ability to perform his job. The Plaintiff still put in a full day of work doing "projects as everyone

else does."[13]  (Pl.'s Dep. 46.) Accordingly, the Defendant is entitled to summary judgment on the Plaintiff's hostile work environment claim, and the Court need not address the Defendant's affirmative defense. The Court does not purport to rule at this time what evidence the Plaintiff cites in support of his hostile work environment claim might be relevant to his intentional discrimination claim.

## C.    Retaliation (ADEA)

The Plaintiff makes one final claim under the ADEA. He claims that the Defendant retaliated against him for complaining of age discrimination in May 2005, for filing an EEOC

---

[13] It is not clear what injury, and therefore what damages, the Plaintiff is seeking in relation to his hostile work environment claim. Although the Plaintiff claims that stress required him to take medical leave in June 2005, he contends that this leave was necessitated by Richardson's retaliatory conduct. Specifically, he argues that the Plaintiff could no longer control his depression and panic attacks with medication and counseling when he learned that Richardson was telling his co-workers that he was finished at Zimmer. Even if the Plaintiff contends that a hostile work environment was a contributing factor leading to his medical leave, the Plaintiff cannot show pecuniary harm because he continued to receive his full salary of $109,011.00 and benefits during his FMLA leave. The facts of this case do not suggest that equitable relief, such as reinstatement, is appropriate because the Plaintiff has retired from Zimmer and is collecting social security disability benefits.

Although it is not the typical case where damages are addressed at the summary judgment stage, and the Court makes no ruling regarding damages in this Opinion, the Court notes that the uncertainty surrounding damages may be problematic to any claim for recovery under a hostile work environment theory because money damages under the ADEA are limited to back pay and liquidated damages (in an amount equal to the pecuniary losses suffered) for willful conduct. *C.I.R. v. Schleier*, 515 U.S. 323, 325 (1995) (noting the ADEA's incorporation of the enforcement and remedial mechanisms of the Fair Labor Standards Act of 1938; 29 U.S.C. §§ 216(b) & 626(b). In certain circumstances, the ADEA also provides for equitable relief, such as reinstatement or front pay. *See* 29 U.S.C. § 626(b). The ADEA does not allow recovery of monetary damages for pain and suffering or emotional distress. *C.I.R.*, 515 U.S. at 326 (noting that, in accordance with precedent from every circuit, the parties did not dispute this proposition); *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 687–88 (7th Cir. 1982) (holding that "in light of the language of the [ADEA], the statutory context, and the legislative purpose as expressed in the remedial scheme and legislative history, we find, in accord with the overwhelming weight of authority, that punitive damages and damages for pain and suffering are not available under the ADEA"). If the only type of damages the Plaintiff seeks because of the purported harassment is related to emotional distress, or pain and suffering, the claim is without legal remedy under the ADEA. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773–74 (7th Cir. 2002) (dismissing ADEA job elimination claim as moot where the plaintiff would have no right to back pay because his transfer from the (eventually) eliminated job did not affect his pay and benefits, and reinstatement was not an option because the plaintiff was legitimately terminated from his second position and his previous position no longer existed); *see also Collazo v. Nicholson*, 535 F.3d 41 (1st Cir. 2008) (affirming summary judgment in favor of employer on the plaintiff's ADEA hostile work environment claim because the plaintiff's claim for compensatory damages for pain and suffering was not recoverable under the ADEA).

Charge of Discrimination in July 2005, and for complaining that Milton was retaliating against him (which precipitated his October 2005 EEOC Charge of Discrimination).

The ADEA makes it unlawful "for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). In asserting a charge of retaliation under the ADEA, a plaintiff may proceed under the direct or indirect methods of proof. In the retaliation section of his brief, the Plaintiff does not indicate which method of proof he intends to use. However, in the beginning of his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, the Plaintiff states that "[t]his is a simple, direct evidence case" involving "age discrimination and *retaliation* and FMLA interference." (Pl.'s Mem. 1) (emphasis added). Given this statement, and the fact that the Plaintiff does not mention the elements of a *prima facie* case under the indirect method of proof, the Court will analyze the Plaintiff's retaliation claim under the direct method of proof.

To show retaliation using the direct method, the plaintiff must offer evidence that his employer took materially adverse action against him because he engaged in protected activity. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 829 (7th Cir. 2007) (noting that an employee proceeding under the direct method must show the employer's decision was based on a prohibited animus); *see also Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 558 (7th Cir. 2008) (stating that under the direct method of proof a plaintiff can prove retaliation "by showing that her (1) statutorily protected activity (2) caused (3) an 'adverse employment action'"). A plaintiff can prevail under the direct method by showing an admission of discrimination or by presenting

"circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). Once the plaintiff has succeeded in making a *prima facie* case under the direct method of proof, the defendant can still prevail if it proves by a preponderance of the evidence that it would have taken the same action in the absence of protected activity, and this evidence goes unrebutted by the plaintiff. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (holding that summary judgment may be granted in favor of the defendant if it "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive" (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

The Plaintiff claims that the following actions constitute unlawful retaliation for complaining about age discrimination: (1) Richardson told everyone in the department that the Plaintiff was fired; (2) Richardson threatened the Plaintiff's coworkers to get them to help him cover-up the fact that his performance accusations about the Plaintiff were false; (3) Richardson broke into the Plaintiff's computer to search for his legal correspondence; (4) Abel did not promptly investigate the Plaintiff's claims, but agreed to proceed with removing the Plaintiff from his position based on Richardson's false comments; (5) the Defendant asked him to perform a Power Selling dry run to assess his knowledge and ability to do Power Selling presentations; and (6) the Defendant assigned the Plaintiff to a new position that required him to have significant product knowledge despite his expressed concerns about being placed in such a position. These alleged acts of retaliation can be divided into two groups: those taken by Richardson, and those that occurred after Richardson's employment was terminated. The Court will address them in turn.

## 1.    *Richardson's Alleged Acts of Retaliation*

The record supports the Plaintiff's claim that Richardson reacted negatively to the Plaintiff's complaints about him and did not want the Plaintiff to return to work in the Training Department. However, none of the actions that Richardson took, either separately or cumulatively, meet the materially adverse requirement of a retaliation claim.

The adverse action giving rise to a retaliation claim must be "materially adverse." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *see also Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) ("Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action"). Materially adverse actions are not limited to employment-related activities but include any actions that would dissuade a reasonable employee from exercising his statutory rights under the ADEA. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). "Material adversity" separates significant from trivial harms, *id.*, because "not everything that makes an employee unhappy is an actionable adverse action," *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001).

Richardson's statements to other employees that the Plaintiff would be fired do not meet the material adversity requirement. Importantly, Richardson's threats were not accompanied by, and did not culminate in, any tangible consequence. There is no evidence that the Plaintiff believed, or had reason to believe, that Richardson had the authority to terminate him without approval from Human Resources. The Plaintiff states in his Affidavit that, because he previously held the position that Richardson did, he knew Richardson did not have the authority to change his job title without going through the Defendant's Human Resources Department and preparing paperwork. A reasonable employee would know that Richardson could only provide input

regarding any employment decision affecting the Plaintiff. And although it appeared that Abel initially agreed with Richardson about the Plaintiff's performance and about his potential termination, Richardson's recommendation was never acted upon. This sequence of statements and threats is no more actionable than a job warning unaccompanied by any tangible job consequence. *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001) (noting that because an employee who was reprimanded with two warnings was not terminated, placed on probation, or hindered in any way from maximizing his pay under a company rule, the warnings did not rise to the level of a materially adverse employment action); *cf. Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (stating regarding retaliation claim that the Seventh Circuit has "explicitly held that 'a suspension without pay that is never served does not constitute an adverse employment action'" (quoting *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005)). The outbursts or threats of a supervisor to other employees are far less formal than the non-actionable job warning issued in *Kersting*. Additionally, Richardson's comments are not actionable on the basis that they generated hostility toward the Plaintiff by his co-workers, *see, e.g., Malozienc v. Pac. Rail Servs.*, 606 F. Supp. 2d 837, 875 (N.D. Ill. 2009) (distinguishing a case where retaliation was supported by evidence that a supervisor made harsh and negative comments in front of co-workers who laughed at the plaintiff), because the record contains no evidence of such hostility and provides no basis to believe that the Plaintiff's co-workers would have input in any employment decisions regarding the Plaintiff.

Even if mere threats were sufficiently adverse, Richardson's comments were made during the Plaintiff's planned absence from work. The Plaintiff only heard about the comments from a co-worker when the Plaintiff called into work near the end of his vacation. Thereafter, on

July 13, he filed his EEOC Charge of Discrimination. Later, when he came back to the office, the Plaintiff was immediately given an opportunity to meet with Abel to discuss his concerns about Richardson's treatment of him. Abel told the Plaintiff that he would investigate the Plaintiff's allegations. Thus, Richardson's comments did not deprive the Plaintiff of the ability to do his work because they were not made to the Plaintiff while he was at work and expected to perform work.[14] Although a reasonable employee in the Plaintiff's position could believe that Richardson actually wanted his employment terminated, a reasonable employee would not be dissuaded from exercising his statutory rights under the ADEA when the supervisor, who had been expressing that his job may be at stake for quite some time, continued to voice this desire to co-workers who would have no impact on any employment decision affecting the Plaintiff.

Similarly, Richardson's threats to the Plaintiff's co-workers to solicit their cooperation with Richardson in any investigation, and to support his version of events, did not have a tangible impact on the Plaintiff's job and did not generate hostility by his co-workers. Additionally, the record does not indicate that the Plaintiff was aware that Richardson was asking his co-workers to do this. Thus, it is not action that would deter a reasonable employee from filing a complaint of discrimination.

Richardson's accessing of the Plaintiff's work computer on one occasion to look for his legal correspondence is not materially adverse. Again, the evidence is that Richardson did this without the Plaintiff's knowledge while he was on leave. No designated facts indicate that the Plaintiff was aware that Richardson accessed his computer, either before the Plaintiff returned to

---

[14] The Plaintiff claims that it was a violation of the FMLA for the Defendant to put him on paid administrative while it investigated his complaints of age discrimination and determined what his job duties would be. However, there is no contention or evidence that the paid leave was related to or caused by Richardson's threats that the Plaintiff was going to lose his job.

work or after he returned when Richardson was no longer his supervisor or a Zimmer employee. Additionally, the Plaintiff fails to point to any tangible consequence or hardship that he suffered as a result of Richardson accessing his computer. Under these circumstances, Richardson's accessing of the Plaintiff's computer would not deter a reasonable employee from exercising his right to file a charge of discrimination.

## 2.      *Other Alleged Acts of Retaliation*

The Court next turns to the claims of retaliatory actions that do not involve Richardson. These include the Plaintiff's claims that Abel did not promptly investigate his claims and instead took actions to remove him from his position, that Milton required him to perform a Power Selling dry run, and that he was assigned the executive level knee class instead of Power Selling duties.

It is undisputed that Abel did not act on his approval of Richardson's recommendation that the Plaintiff should be removed from his position for performance reasons and that ultimately Abel recommended termination of Richardson's employment instead. Nevertheless, the Plaintiff argues that the Defendant's unlawful conduct did not end but rather that the Defendant, now "armed with the knowledge that Barton had a fragile psyche, proceeded to destroy him." (Pl.'s Mem. 16.) Elaborating on this theory, the Plaintiff contends that the Defendant knew that he had been on medical leave for stress, and that he was concerned that he may be put in a job with technical demands for which he lacked training and ability. The Plaintiff argues that the Defendant kept him off of work "for the phony reason of providing 'a clear and commonly understood set of job responsibilities to facilitate [his] return to the group.'"

(Pl.'s Mem. 17 (citing Pl.'s Aff. II ¶ 98).) The Plaintiff believes that he was kept off of work so that Abel could "secretly create an entirely new job for [the Plaintiff] with specific responsibilities for significant product knowledge." (Pl.'s Mem. 17.) The Plaintiff highlights the fact that Abel gave Richardson the task of creating the new position while the Plaintiff was still off of work, and that this "time lag" allowed Richardson to make a written statement to Human Resources expressing his opinion that allowing the Plaintiff to return to work in the Training Department would be a mistake. The Plaintiff argues that all these actions are consistent with Abel's email statement that the Plaintiff should be removed from his position for failure to perform, recognizing that removal would likely result in his termination. The Plaintiff submits that his eventual assignment to the executive level knee sales training class was unreasonable and deliberately designed to cause him extreme anxiety and grief, which led to his mental collapse and inability to return to work at Zimmer.

The Plaintiff's evidence fails to show a genuine issue of fact that is material to a cognizable retaliation claim. Neither Abel's June 14 email message expressing approval of Richardson's assessment that the Plaintiff was not performing and should be removed from his position, nor his subsequent decision to have Richardson develop a new job description, had an adverse impact on the Plaintiff's employment. Likewise, Richardson's opinion that the Plaintiff should not continue his employment in the Training Department did not cause any injury or harm to the Plaintiff, as he returned to the Training Department and Abel recommended, instead, that Richardson's employment be terminated for his divisive management style. Moreover, before actions can be said to have the likely effect of dissuading a reasonable employee from making a charge of discrimination, these actions must be known to the employee who is claiming the

dissuasive impact. An action of which an employee is unaware and which does not create harm cannot be a deterrence. The Plaintiff does not designate any evidence to indicate that he was aware of the email communication between Abel and Richardson. What the Plaintiff did know is that, when he returned to work, he told Abel about Richardson's actions, that Abel stated he was going to investigate, and that the Plaintiff would be allowed to meet with Abel and Richardson for the purpose of discussing his job duties. He also knew that he was being paid his full salary and not being made to work under Richardson without clear directives and objectives. Because a reasonable employee faced with these circumstances would not have reason to believe that his employer was plotting to get rid of him for complaining about discrimination, he would not be dissuaded from exercising his statutory rights.

Even if the Court were to assume that Abel was mistaken to believe Richardson's version of events regarding the Plaintiff's performance issues, or that Abel should have contacted the Plaintiff at some point during his extended leave, the evidence before the Court does not suggest that these decisions were motivated by a desire to retaliate against the Plaintiff for complaining of discrimination. Indeed, the record is void of any evidence, either direct or circumstantial, from which a jury could infer a causal connection between the Plaintiff's protected activity and the manner in which Abel's investigation was carried out.

The Plaintiff implicates Milton as an actor in the retaliatory scheme that he contends was put in place to ensure termination of his employment. Regarding the first purported act of retaliation, it is unclear how Milton's request that the Plaintiff do a dry run to assess his knowledge and ability to do a Power Selling presentation, which he argues Milton made "unnecessarily difficult and destined to fail" (Pl.'s Mem. 18), was a materially adverse action.

The Plaintiff testified that he does not contend that there was any link between his poor review on the Power Selling dry run and the assignment to develop training materials for knees. (Pl.'s Dep. 84.) There is no evidence that the dry run task itself kept the Plaintiff from other duties that he was expected to perform, was an objectively demeaning request, or would be used to determine any tangible employment benefits. Rather, the Plaintiff's sole complaint appears to be that it was humiliating to be subjected to review by others, particularly because he had not received adequate training in Power Selling or clear instructions regarding how to conduct the dry run. He also states that it was unfair for Milton to criticize him for not being set up on time when it was she who failed to communicate that the presentation location had changed. Even if the embarrassment the Plaintiff suffered could constitute material adversity, the Plaintiff has not designated any evidence, direct or circumstantial, that Milton assigned and conducted the dry run in the manner that she did out of retaliatory motives. The Plaintiff contends that Milton made his dry run more difficult than Schieferstein's or Cline's, two employees who did not complain of discrimination, by giving him two modules to prepare (instead of Cline's one module) and changing the room assignment while he was setting up for his presentation (which Milton did not do to Cline). Although evidence that similarly situated employees were treated differently may constitute relevant circumstantial evidence of improper motives, the differences cited in this case do not support an inference of retaliatory motive. *See Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007) (describing the types of circumstantial evidence relevant under the direct method of proving discrimination in the employment context). First, the differences cited by the Plaintiff do not suggest "systematically better treatment," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), because the Plaintiff only compares himself

to one employee, Cline. (Pl.'s Statement of Genuine Issue ¶¶ 182–87.) Even with this one

comparison, the differences are not compelling. For example, the Plaintiff concentrates on the

fact that he was given two modules to prepare for instead of one, but does not address Milton's

deposition testimony that she gave the Plaintiff the "easiest" "introductory kind of modules."

(Milton Dep. 21.) There is no evidence showing that Schieferstein or Cline had more training in

Power Selling when they were asked to do the dry run, or that their assigned portions were easier

than the Plaintiff's. The fact that a last-minute room change affected the Plaintiff, but not Cline,

is too peripheral and insignificant to the dry run assignment to allow a jury to infer intentional

retaliation.

The final act of retaliation charged by the Plaintiff was his assignment of duties related to

knee training. The Court will assume, for purposes of summary judgment, that assigning the

Plaintiff these new job duties instead of allowing him to teach Power Selling was a materially

adverse action. To establish that the action was unlawful retaliation, the Plaintiff must still

designate evidence to support the inference that the assignment was motivated by retaliatory

animus. This case does not involve any statements that point directly to a retaliatory motive. *See*

*Volovsek v. Wis. Dep't of Agr., Trade & Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003)

(stating that admissions or statements by a decision maker regarding his unlawful intent are

"understandably rare"). "The more common type of evidence is circumstantial evidence that

allows a jury to infer intentional discrimination or retaliation." *Id.* There are three general

categories of circumstantial evidence:

> (1) suspicious timing, ambiguous statements, behavior towards other employees
> and so on; (2) evidence, but not necessarily rigorous statistical evidence, that
> similarly situated employees were treated differently, or (3) evidence that the
> employee was qualified for the promotion and passed over and the employer's

reason for the difference in treatment is a pretext for discrimination. *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994).

*Volovsek*, 344 F.3d at 689–90. "The third category bears an eerie similarity to the evidence required under the indirect method." *Id.* at 690 (citing *Huff v. UARCO Inc.*, 122 F.3d 374, 380 (7th Cir. 1997)).

A considerable amount of the Plaintiff's designated evidence regarding retaliation is dedicated to establishing that the new job assignment was unreasonable and therefore adverse. Ignoring this evidence (because the Court is assuming the action was adverse), the Plaintiff appears to rely heavily on suspicious timing as proof that his employer was acting with retaliatory motives. In his brief, the Plaintiff recites the chronology of events leading up to his new assignment and attributes it to "Abel's secretive actions to permanently drive Barton away from Zimmer." (Pl.'s Mem. 19.) However, only in rare cases will suspicious timing alone be sufficient to establish causation. *Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (reminding courts that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue"). Normally, "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Here, the evidence suggests just the opposite—that the two events were entirely unrelated. In the context of the changes that were taking place in the Training Department, both as to the philosophy of teaching the sales force and the availability of personnel, the timing of Milton's decision to assign the Plaintiff the knee portion of training does not constitute relevant and probative evidence of a causal link between the protected activity and

the assignment of new duties. In other words, there is no evidence from which a jury could infer that the Plaintiff was assigned to develop the knee training course materials, instead of teaching Power Selling classes, because he had exercised his right to file a charge of discrimination. A jury would have to speculate that, when the Training Department was directed to develop new materials, Milton gave the job of developing teaching materials for one of the Defendant's most important products to an employee (i.e., the Plaintiff) whom she knew did not have the requisite skills to succeed in the task because she wanted to retaliate against him for complaining about a previous supervisor.

To counter the evidence that the business and personnel changes within the Training Department prompted his new assignment, the Plaintiff also advances an argument that is similar to the third type of circumstantial evidence. He submits that he was qualified to teach Power Selling, but not to create the training materials for knees, and that Radford should have been given the knee assignment. For this to be probative of retaliatory motive, the Plaintiff must present evidence that the Defendant's reasons for giving the assignment to him instead of to Radford was a pretext for retaliation. *See Volovsek*, 344 F.3d at 689–90 (describing circumstantial evidence that is sufficient to create an inference of discrimination); *see also Stone*, 281 F.3d at 644 ("If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment.").

The Plaintiff has not presented evidence from which a jury could infer intentional retaliation. First, although the Plaintiff designated evidence to support the conclusion that his performance teaching a Power Selling class was on par with Radford's, he has not presented evidence about his qualifications that are "so favorable to the plaintiff that there can be no

dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006) (describing strength of evidence required to establish that failure to get a certain job or promotion was an adverse employment action). Nor has he presented evidence showing that Milton should have known that Radford was clearly more qualified to create the knee materials. The Plaintiff himself contends that Radford was still not able to teach the knee sales training classes on his own when Milton began as Interim Director in September 2005, that Bowman was still helping Radford with the knee sales training classes at that time, and that Radford only began teaching the knee sales training classes by himself, but with significant help from marketing, after Bowman left the Sales Training Department at the end of December 2005. The undisputed evidence is that Radford had been training in Power Selling since Richardson was the Director and had experience teaching Power Selling. On the other hand, the Plaintiff, by his own admission, was not trained in Power Selling. Certainly, the mere fact that Radford's title related to knees did not bind Milton regarding whom she could appoint for various tasks within the Department.

It is also undisputed that when Milton assigned the Plaintiff to develop the knee course materials, she believed that he was equipped for the role because of his previous knee product responsibilities within the Sales Training Department, including teaching knee sales training classes. When Barton was a Sales Training Manager, he was responsible for facilitating training selling skills involving the knee. Barton organized the training and brought in the subject matter experts to teach it. When the Plaintiff informed Milton that he did not actually have the requisite technical knowledge, she did not accept his complaints but countered with suggestions for

sources of help. For example, she directed him to speak with marketing because product managers in the marketing department had a responsibility for being aware of competitors' products, and at least two or three employees in the marketing department had previously worked for a Zimmer competitor. She also suggested that he consult competitors' websites. Milton asked Radford to be available to the Defendant for thirty minutes each day to discuss the class and to help the Plaintiff locate the content, and Radford gave Barton all of the materials Radford had prepared for the previous sales training class, including competitive knee information.

The Plaintiff contends that, for various reasons, none of this was sufficiently helpful. Indeed, whether the assignment was reasonable is one of the vigorously disputed issues in this case.[15] However, this dispute does not create a triable issue of fact because, when the evidence is viewed most favorably to the Plaintiff, it does not call into doubt the sincerity of Milton's belief that sufficient resources and time were available to the Plaintiff to complete the assigned task, and the "analysis of pretext focuses only on what the decisionmaker, and not anyone else, sincerely believed." *Little v. Ill. Dep't of Rev.*, 369 F.3d 1007, 1015 (7th Cir. 2004). The Plaintiff's dispute regarding the reasonableness of the expectations does not address whether the expectations were legitimately held. *See, e.g., Perkins v. G.E. Capital Auto Fin. Servs.*, 6 F. App'x 320, 2001 WL 278171, at *7 (7th Cir. Mar. 19, 2001) (finding that employer's

---

[15] In addition to the numerous facts provided on this point, the Plaintiff has provided the Affidavit of John Kuras, a witness whose testimony the Plaintiff contends "will assist the trier of fact in understanding the development of a knee sales training manager and the working relationships between knee sales training managers and their respective marketing and product management departments." (Pl.'s Resp. to Def.'s Motion to Strike 1, DE 155.) The Defendant has moved to strike [DE 130] the affidavit on the ground that it does not meet the qualifications for the admissibility of expert testimony. The Court will not address the merits of the Motion to Strike in this Opinion and Order.

expectations were legitimate even if they may have been "unreasonably high, foolish, or trivial"). All three employees assigned to create new class materials were given the same time frame.  Although the Plaintiff may be correct in his assertions that teaching Power Selling was a less stressful position than the one Milton assigned to him and that he was not qualified to perform the assigned tasks, specifically in the time-frame allotted, these fact do not speak to Milton's motive. "On the issue of pretext, [the Court's] only concern is the honesty of the employer's explanation." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (quoting *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997)). In the absence of any evidence that Milton's belief's were not sincerely held, the Court is left to assume the role of reviewing the merits of Milton's decision and the relative qualifications of Radford and the Plaintiff, but the Court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Balderston v. Fairbanks Morese Engine Div. of Coltec Indus.*, 328 F.3d 309, 324 (7th Cir. 2003) (citing *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)); *see also Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (noting that "[t]he question is not whether the employer properly evaluated the competing applicants, but whether the employer's reason for choosing one candidate over the other was honest") (citing *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997)); *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 304 (7th Cir. 1996) (stating that when a court is dealing with "an employer's subjective comparison of one employee to another . . . it is incumbent . . . to remember that what is at issue is not the wisdom of an employer's decision, but the genuineness of the employer's motives"). The Plaintiff has not shown that the Defendant did not believe assigning Radford to teach Power Selling and the Plaintiff to create class materials was the best use of its personnel and was

instead using the assignments as an opportunity to retaliate against the Plaintiff.

The Plaintiff further advances his pretext argument by claiming that Milton was not directed by upper management to create new training content, and that it was not necessary to create new materials. In support of his argument that Milton was not acting on directives as she claims, he cites to Radford's testimony that Radford did not know why Milton wanted the Plaintiff to develop all new material for the knee sales training class, and to the fact that Bowman had recently redesigned the entire knee sales training class starting in September 2004, including new slides, new format, new materials, and integration of Power Selling. As evidence that creating executive level training materials was not a legitimate assignment, the Plaintiff also considers it relevant that the Defendant never pursued or presented the executive level knee or trauma and extremities sales training classes after the Plaintiff went on sick leave in February 2006. Instead, for the March and May 2006 classes, Radford taught the same knee sales training class that he had previously taught and did not use anything that Barton had prepared for the executive level course.

Radford's testimony does not have the significance that the Plaintiff submits. Radford simply stated that he did not know, and could not speak to, what Milton was trying to do. (Radford Dep. 39–40.) This is consistent with the fact that he was not charged with making director level decisions. It also highlights the point that his opinion on the matter would not be probative evidence of pretext because challenging the wisdom of a decision is not the same thing as refuting its veracity. *Cf. Giannapoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997) (stating that in the pretext analysis it is not the Court's "province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason

for the [adverse employment action]"). Moreover, in this same deposition, Radford explained, when he was asked if he knew why the Plaintiff was designing a new class, that his "recollection was that the whole department needed to upgrade and modernize, so Mike Schieferstein was required to do it for hips, and Larry Cline was required to do if for trauma and for upper extremities, so it wasn't just Bruce, it was everybody." (Radford Dep. 50–51.)

Likewise, neither Bowman's recent redesign of the class materials, nor the Defendant's later decision to take a different direction, is evidence that the Defendant did not honestly believe that changing the class materials was a good business decision at the time that the decision was made and implemented. An employer is entitled to make mistakes and poor business decisions without those mistakes being imputed as a pretext for discrimination. *See Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (describing pretext as "a dishonest explanation, a lie rather than an oddity or an error"). Pretext is more than a business error: it is deceit used to cover one's tracks. *Id.* at 684. If an employer honestly believed its reasons, pretext has not been shown even if those reasons were "mistaken, ill considered or foolish." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). The Plaintiff's evidence does not show an issue of fact regarding whether the Defendant honestly believed that class materials should be updated. Moreover, it is not reasonable to suggest that Milton and others in management would expend significant company resources by assigning the Plaintiff (and two other employees) a task on the pretense of creating a new training model for sales personnel just so they could see the Plaintiff fail, in the hope that he would then quit from the stress or have his employment terminated.

When the evidence presented by the Plaintiff is considered in its totality and given

inferences most favorable to the Plaintiff, many of the Plaintiff's purported acts of retaliation cannot be considered materially adverse. For those actions that could be considered materially adverse, the Plaintiff has not put forth direct or circumstantial evidence to support an inference that the Defendant acted with retaliatory intent. While genuine issues of fact exist regarding whether the expectations were unreasonable and the assignments too difficult, these issues of fact are not material because the Plaintiff does not designate any specific facts supporting an inference that the Defendants were motivated to give him the assignments because the Plaintiff filed a charge of discrimination or complained about age discrimination. Without specific facts to support on inference of retaliation, a decision imposing liability on the Defendant would represent punishment "for choices that constitute business decisions alone," *Guerrero v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001), which is improper "no matter how unwise or mistaken they may seem, *id.*"[16]

### D.    FMLA Interference

The FMLA entitles any eligible employee to twelve weeks of medical leave if the employee is unable to perform the functions of his position due to a serious health condition. 29

---

[16] The Court notes that it has not specifically addressed every factual detail in the Plaintiff's Statement of Genuine Issues, but that it has carefully reviewed and considered all of the submissions to determine their relevance to the Plaintiff's claims. The Court has left out those facts that it has concluded would constitute "an amorphous litany of complaints about a myriad of workplace decisions," which "does not necessarily meet a plaintiff's burden of proof." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (emphasizing that "it is simply not true . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent"). Examples of such irrelevant evidence include the following: that when the Defendant appointed Milton as the Interim Director it was the only time that the Defendant appointed anyone as an interim instead of leaving the position vacant until another director was hired or appointed; that even though he was given new job duties, there were no changes to the Defendant's records to reflect a change in job title; that Milton invited Abel to attend a meeting where the Plaintiff presented the knee class materials that he prepared; and that Milton kept notes of her interactions with the Plaintiff.

U.S.C. § 2612(a)(1)(D). The FMLA also entitles the employee who takes such leave to be returned to the same, or an equivalent, position that he held just before taking leave. 29 U.S.C. § 2614(a)(1)–(2). An employer cannot interfere with, restrain, or deny an employee's attempt to exercise any of his FMLA rights, 29 U.S.C. § 2615(a)(1), including the right to reinstatement. To prevail on an interference claim, a plaintiff must show the following: (1) he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008).

The Plaintiff makes two distinct claims of interference. He alleges that the Defendant denied him an FMLA benefit (1) when it did not allow him to return work immediately after his leave ended on August 22, 2005, and (2) when it did not return him to the Manager, Performance Improvement and Development position or an equivalent position when the Defendant finally allowed him to return to work on September 13, 2005. The only prong in dispute for either claim is the fifth prong: whether the Defendant denied the Plaintiff an FMLA benefit to which he was entitled. The burden to prove interference lies with the Plaintiff. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008).

1.    *Paid Administrative Leave upon Return*

The Plaintiff contends the Defendant violated the FMLA when it refused to restore him to his position on August 22 and instead placed him on paid administrative leave until it found a suitable position for him. The Defendant's position is that Abel's investigation and the Plaintiff's

leave were necessitated by the Plaintiff's complaints of age discrimination. The Defendant asserts that, "[h]aving complained of age discrimination and that the duties he was offered were demeaning, Zimmer had an obligation to conduct an investigation and ensure Barton had fair responsibilities upon his return to ensure he was not retaliated against for complaining." (Def.'s Reply 13.) The Defendant states that the Plaintiff was placed on paid administrative leave so that the Defendant could determine duties for the Plaintiff that he would not characterize as demeaning or impossible and thereby attribute to age discrimination.

The Defendant's argument in defense of its actions is based on the FMLA principle that the right to reinstatement is not absolute and unlimited. *See Simpson v. Office of Chief Judge of Cir. Ct. of Will County*, 559 F.3d 706, 712 (7th Cir. 2009) (citing 29 U.S.C. § 2614(a)(3)(B)). "[A]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a); *see also* 29 U.S.C. § 2614(a)(3) (providing that an employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave").

The Defendant has presented evidence that it would have placed the Plaintiff on paid administrative leave regardless of his FMLA leave, because the purpose of the paid leave was to give Abel an opportunity to investigate the Plaintiff's age discrimination complaints, particularly as they affected the Plaintiff's job duties. The Plaintiff has the burden to overcome the Defendant's assertion. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625 (7th Cir. 2009); *see also Simpson*, 559 F.3d at 712–13 (stating that after an employer presents evidence that the employee was not entitled to a position regardless of his leave, the plaintiff must overcome the employer's

assertion and raise a genuine issue of material fact that he was entitled to be reinstated); *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001).

The Defendant is entitled to summary judgment because the Plaintiff has not countered the Defendant's assertion with evidence from which a jury could find that the Defendant would not have placed the Plaintiff on paid leave while it determined his job duties (and appointed a new supervisor) but for the fact that he took FMLA leave. Although the Plaintiff argues that placing him on paid administrative leave was an improper response to his complaints of age discrimination, the Plaintiff makes no attempt to link his FMLA leave to the Defendant's decision regarding paid administrative leave. The record is completely void of evidence that the Defendant's investigation or desire to fashion appropriate job duties was prompted by the Plaintiff's medical leave, as opposed to his complaints that his job responsibilities were being affected by an age-biased supervisor. Rather, the sequence of events supports the Defendant's claim that the paid administrative leave was entirely unrelated to the FMLA leave.

In his Memorandum Opposing the Defendant's Motion for Summary Judgment, the Plaintiff argues that the Defendant's claim that it "kept Barton away in order to conduct the age discrimination investigation is a disputed issue of fact," because the real reason was to determine his job duties (Pl. Mem. 24), and that in any event no investigation was being conducted during the last two weeks that he was on paid administrative leave. These arguments are not compelling. The task of trying to determine appropriate job duties for the Plaintiff was not (as the Plaintiff's argument assumes) unrelated to his complaints concerning age discrimination. In fact, the issues surrounding the Plaintiff's job duties were directly linked to his complaints of age discrimination; the Plaintiff specifically alleged that the job responsibilities Richardson gave him

69

were the result of Richardson's age animus. Thus, any outstanding issues regarding the Plaintiff's job duties were related to the problems with Richardson's supervision. After Abel completed his investigation, he drafted a proposal calling for Richardson's termination. After the proposal was reviewed, the Defendant took steps to terminate Richardson's employment, and the Plaintiff was brought back to work the day following Richardson's termination. Even if the Plaintiff is correct that this series of events does not explain the delay, and that an issue of fact exists regarding whether the Plaintiff was still investigating matters related to his age discrimination complaints during the last part of his leave, such a dispute does not suggest that the paid administrative leave was related to the Plaintiff taking FMLA leave, or that he would have been at the office instead of on paid leave if he had been continuously employed during the FMLA leave period. Thus, any issue of fact regarding whether the investigation was still open does not create a barrier to summary judgment because it is not a dispute that might affect the outcome of the suit. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). The Court also notes that the mere fact that the Plaintiff was on leave when the Defendant discovered the problems with the Plaintiff's job responsibilities and with Richardson's supervision of the Training Department did not bar it from being able to use paid administrative leave, or any other measure it would have otherwise used, to address the issue. *See Simpson*, 559 F.3d at 713 ("That Simpson was fired while on medical leave does not alter our inquiry."); *cf. Cracco*, 559 F.3d at 636 (stating that "[t]he fact that the leave permitted the employer to discover the problems does not bar the employer's ability to terminate the deficient employee").

In support of his argument that the Defendant violated the FMLA, the Plaintiff points to *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004). In this case, the Sixth

Circuit held that restoration is required upon an employee's return to work, and not within a reasonable time after the employee's need for FMLA leave has ended. 384 F.3d at 247. This Court does not take issue with the holding in *Hoge*, but the Court does dispute its applicability to this case because *Hoge* did not involve an assertion by the employer that it would have taken the actions it did regardless of the plaintiff's leave. The *Hoge* court acknowledged the statutory limitations on the right to restoration, including the limitation expressed in 29 U.S.C. § 2614(a)(3) and 29 C.F.R. § 825.216(a), but then stated that "[n]one of these limitations to Hoge's right to restoration apply." 384 F.3d at 246 (noting that the employer did not dispute the plaintiff's right to restoration or argue that any of the recognized limitations applied, but merely disputed the timing of the duty to restore). For this reason, *Hoge's* ruling is not applicable to the facts of this case.

When the Plaintiff notified the Defendant that he was able to return to work, the Defendant took him off FMLA leave and, for reasons unrelated to his FMLA leave, placed him on paid administrative leave. There is no evidence from which a jury could conclude that the Defendant would have taken a different course of action had the Plaintiff not taken FMLA leave. Accordingly, he has not established that he was denied an entitlement under the Act, and his interference claim fails as a matter of law. *Cracco*, 559 F.3d at 636.

## 2.     *Restoration to the Same or an Equivalent Position*

The Plaintiff contends that the Defendant violated the FMLA a second time when it did not reinstate him to his previous position, or to an equivalent position, when he returned to work on September 13, 2005. The Plaintiff argues that, instead of being assigned duties consistent

with his Manager, Performance Improvement and Development position, the Defendant unlawfully assigned him to develop and present the executive level knees sales training classes. In defense of this claim, the Defendant asserts that the Plaintiff received a new assignment in response to changes being made within the Training Department. The Defendant submits that the Court need not determine whether the Plaintiff's pre-leave position was equivalent to his position upon return because the right to reinstatement is not absolute, and the Plaintiff has failed to prove that the Defendant would not have assigned him the responsibilities that it did had he not taken leave.

The Court concludes, as it did with the first interference claim, that the provisions of § 2614(a)(3) and 29 C.F.R. § 825.216(a) defeat the Plaintiff's claim that he was entitled to teach consultive selling skills courses upon his return. The Seventh Circuit's explanation of these provisions in *Breneisen v. Motorola, Inc.*, reveals their relevance to the facts of this case:

> "Nothing in [ 29 U.S.C. § 2614] shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). This means that if an employee's position is eliminated while he is on FMLA leave for reasons unrelated to the taking of leave, he has no right to reinstatement. See 29 C.F.R. § 825.216(a); *see also Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006); *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804–05 (7th Cir. 2001). When an employer claims that the employee's position would have been eliminated even if the employee had not taken leave and provides some evidence to that effect, the employee must convince the trier of fact that his position would not have been eliminated had he not taken leave. *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000).

512 F.3d 972, 977–78 (7th Cir. 2008); *see also* 29 U.S.C. § 2601(b)(3) (stating that the FMLA seeks to accomplish its purposes "in a manner that accommodates the legitimate interests of employers").

The Defendant claims that the Plaintiff's job duties would have been revised even if he had not taken leave because the Training Department was undergoing changes. Milton testified that she gave the Plaintiff his assignment on the basis of "what needed to be done as a department." (Milton Dep. 64.) She added:

> Again, when I came in, there were things that were being accomplished and readied to roll out that changed the complexion of the entire department. So irrespective of what Bruce had before . . . . So what I had to do and what I did was come in and have one-on-ones with everybody, kind of assess what was going on in the department to see where we were and where we needed to be.

(Milton Dep. 64.) The Plaintiff was not the only employee within the Department to be assigned new duties, and the Defendant has provided ample evidence to support its claim that upper management requested that new class materials be developed to replace the old teaching model, and that Milton believed that the Plaintiff was the best choice among available personnel for development and presentation of executive level knee sales training classes. Therefore, regardless of whether the Plaintiff's job was the same or equivalent to his job before he took FMLA leave, the Plaintiff is not entitled to present this claim to a jury unless there is genuine issue of fact whether the Defendant would have given him these assignments if he had not taken FMLA leave.

However, no such issue of fact exists because the Plaintiff has not addressed the Defendant's claim that, upon his return, he received assignments that were consistent with the needs of the Department, and that he would have been assigned these projects regardless of whether he took FMLA leave. Rather, in support of his FMLA claim, the Plaintiff relies solely on the argument that there is a disputed issue of fact whether the new assignment was a substantially equivalent job to his previous Manager, Performance Improvement and

73

Development position. Therefore, the Plaintiff has not presented facts from which a jury could find in his favor on the FMLA interference claim.[17]

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [DE 128] is GRANTED in PART and DENIED in PART. The Plaintiff may proceed on his claim that the Defendant intentionally discriminated against him in violation of the ADEA. The Defendant's Motion to Strike Affidavit of Plaintiff's Expert John Kuras [DE 130] is DENIED WITHOUT PREJUDICE subject to automatic renewal as a motion in limine at the time of the Final Pretrial Conference. The Defendant's Motion to Strike Affidavit of Bruce Barton [DE 156], and Motion to Strike Inadmissible Evidence Submitted in Opposition to Motion for Summary Judgment [DE 181] are GRANTED IN PART and DENIED IN PART consistent with the finding contained in this Opinion and Order. The Filing of Supplemental Authority in Support of its Motion for Summary Judgment [DE 202], which appears on the docket as a pending motion, is GRANTED. The Plaintiff's Motion for Oral Argument [DE 175] and the Defendant's Motion for Oral Argument [DE 178] are DENIED as MOOT.

---

[17] Elsewhere in his Memorandum of Law, the Plaintiff argues that assigning him the executive level knee sales training project was retaliation for complaining of age discrimination. Although the Court reviews whether an employer's description of its reasons is honest, it is the employee's burden to prove a violation of the FMLA. *Kohls,* 259 F.3d at 806. "Thus, pretext may have evidentiary value, but showing pretext does not necessarily satisfy the employee's burden." *Id.* (citing *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 713 (7th Cir. 1997) (comparing use of pretext in the FMLA context with the use of pretext in the *McDonnell Douglas* burden-shifting scheme)). Thus, even if the Plaintiff succeeded in creating a genuine issue of material fact whether the assignment was retaliatory, the Plaintiff's own theory would fall short of showing that the Plaintiff would have been assigned the selling duties had he not taken FMLA leave.

SO ORDERED on July 16, 2009.

                              s/ Theresa L. Springmann
                              THERESA L. SPRINGMANN
                              UNITED STATES DISTRICT COURT